**CITY OF DOTHAN, ALABAMA,**
**Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Municipal Electric Authority of Georgia, Intervenor.**

**No. 81–1941.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 12, 1982.

Decided Aug. 3, 1982.

---

9. *See* Note, *supra* note 2 at 648–53.

10. *SEC v. Chenery*, 332 U.S. 194, 197, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).

Alan I. Robbins, Washington, D. C., with whom Donald R. Allen and Glen L. Ortman, Washington, D. C., were on the brief, for intervenor.

Channing D. Strother, Jr., Washington, D. C., with whom Arnold Fieldman, Washington, D. C., was on the brief, for petitioner.

Arlene Pianko Groner, Atty., F. E. R. C., Washington, D. C., with whom Charles A. Moore, Gen. Counsel, and Jerome M. Feit, Sol., F. E. R. C., Washington, D. C., were on the brief, for respondent.

Before MacKINNON and MIKVA, Circuit Judges, and COWEN,* Senior Judge, United States Court of Claims.

Opinion for the Court filed by Circuit Judge MacKINNON.

Dissenting opinion filed by Circuit Judge MIKVA.

* Sitting by designation pursuant to 28 U.S.C.

MacKINNON, Circuit Judge:

After reviewing competing applications for a preliminary permit to investigate development of a hydroelectric facility, the Federal Energy Regulatory Commission (the Commission) determined that the two proposals submitted by parties of equal statutory priority were equally well adapted to serve the public interest and in accordance with its regulations awarded the preliminary permit to the party whose application was filed first. We hold that substantial evidence supports the Commission's decision and that it did not act arbitrarily or capriciously in granting the preliminary permit to the applicant that filed first.

I.

The George W. Andrews Lock and Dam on the Chattahoochee River that forms the boundary between Georgia and Alabama is operated by the United States Army Corps of Engineers (the Army Engineers). On March 7, 1979, Alabama Electric Cooperative, Inc. (Coop) filed an application for a preliminary permit for a proposed hydroelectric power project at the existing Andrews dam site. Nine days later on March 16, 1979, Municipal Electric Authority of Georgia (Georgia) filed a competing permit application for a project at the same dam site. On August 23, 1979, the Commission issued public notice of the two competing applications. In response to that public notice, the Army Engineers wrote to the Commission and gave its approval to the issuance of preliminary permits *provided* that the applicants adhered to the Corps' "General Requirements for Non-Federal Hydroelectric Plant Construction at U.S. Army Corps of Engineers Water Resources Projects." Those requirements necessitate that the "[d]esign, construction and operation of all power facilities that will be an integral part of [a] dam" be approved by the Army Engineers. Brief of Commission at Addendum A3. The Army Engineers also recommended that applicants "closely coordinate their studies" for the projects with the Corps. *Id.* at A2.

§ 293(a).

On October 25, 1979, the City of Dothan, Alabama (Dothan) filed a protest against the Coop and Georgia applications and petitioned for intervention in both dockets. The following day Dothan filed a notice of its intent to file its own competing application. And on December 21, 1979, over nine months after Georgia's application, Dothan filed a competing application for a preliminary permit at the same dam site. Under the controlling statute Dothan was entitled to the same statutory preference for a permit as Georgia because both are instrumentalities of states. Where two municipalities or states apply for preliminary permits for the same project, the Commission favors the applicant whose plans are *better* adapted "to develop, conserve, and utilize in the public interest the water resources of the region . . . ." 18 C.F.R. § 4.33(g)(1) (1981). If the Commission finds that the proposals of two municipalities or states are "equally well adapted" to the objectives of the Act, then it grants the preliminary permit to the applicant that filed first. 18 C.F.R. § 4.33(g)(2) (1981).[1] Coop did not actively participate in the subsequent proceedings, presumably because it was a cooperative corporation, not a state instrumentality, and therefore of a lower statutory priority than either Georgia or Dothan. *See* 18 C.F.R. § 4.33(g)(3) (1981).

Dothan's application included a description of its own proposed project and, as required by 18 C.F.R. § 4.33(d)(2) (1981), contained a detailed statement of why its proposal was allegedly better adapted than Georgia's to developing, conserving and utilizing in the public interest the water resources of the region. Dothan raised a number of points but the most important ones related to two variations from Georgia's proposal:

(1) Georgia's application proposed locating the powerhouse on the Georgia side of the river. Dothan proposed the Alabama bank which provides advantages in terms of cost savings, convenience of construction, efficiency of dam operations and navigational concerns;

(2) Georgia's proposed project design was based on a mistaken assumption of the amount of available "head," *i.e.*, the elevation of the water behind the dam. Georgia's plan assumed an average head of 24 feet whereas 14 to 16 feet was the more correct estimate and Dothan used that.

Commission regulations allowed Georgia 30 days from the date of submission of Dothan's application in which to file, if it so desired, a rebuttal showing that its plans were at least as well adapted as Dothan's. 18 C.F.R. § 4.33(e) (1981). Georgia elected *not* to file such rebuttal. On May 29, 1980, however, Georgia filed a "Protest in Opposition to and Motion to Deny Application for Preliminary Permit Filed by City of Dothan, Alabama" (App. 18–27.) In its protest statement, Georgia agreed with Dothan that the powerhouse would be best located on the Alabama side of the river and revised downward its calculation of the available head. (App. 22–23.) Georgia did not make any other changes in its project design. It did argue, however, that its proposal was at least equal to, if not better than Dothan's because (1) its preliminary engineering study was substantially completed and (2) had produced six alternative proposals incorporating varying sized generating units. Georgia also argued that (3) its proposal would serve many more customers than Dothan's (App. 21.), (4) that it would be better able to integrate the power produced by the Andrews project into an existing power transmission system (App. 22), and (5) that it was in a stronger financial position than Dothan and therefore could assure that the project would be developed (App. 23–24.) and at an earlier date (App. 28–29). Several days later Georgia filed an "Amendment to Protest and Motion" in which it recognized the reduced

---

1. 18 C.F.R. § 4.33(g)(2) (1981) provides:

    If both of two applicants are either a municipality or a state, or neither of them is a municipality or a state, and the plans of the applicants are equally well adapted to develop, conserve, and utilize in the public interest the water resources of the region, taking into consideration the ability of each applicant to carry out its plans, the Commission will favor the applicant whose application was first accepted for filing.

energy production capability of its proposed project. *Id.* We find the dissent's contention that this amendment should justify a

2. The dissent contends that the Commission should now retroactively apply the new regulation on material amendments to Georgia's application for a preliminary permit; *see* 18 C.F.R. § 4.35; 46 Fed.Reg. 55,245 (Nov. 9, 1981); i.e., that the case should be remanded to the Commission to explain, *inter alia*, "why the new regulations governing 'material amendments' to permit applications should not be given retroactive effect." *Dis. Op.* at 168–169.

A remand for such explanation would be pointless since prospective application of the regulations is directed by statute, the record does not reflect that any material change in Georgia's application has taken place under the regulations and the elevation of the water is controlled by preexisting factors.

The decision in this case was issued on May 27, 1981. The new regulations were published as final rules in the Federal Register on November 9, 1981 as the result of formal rulemaking. The Administrative Procedure Act, 5 U.S.C. § 551(4) (1976), expressly provides that a " 'rule' means the whole or a part of an agency statement of general or particular applicability *and future effect* designed to implement, interpret, or prescribe law or policy . . . ." (emphasis added). With specific reference to this provision, this court in the past has noted that "[r]ules so adopted [*i.e.*, through formal rulemaking proceedings] are *prospective in application only.* 5 U.S.C. § 551(4) (1970)." *Retail, Wholesale and Department Store Union, AFL–CIO v. N. L. R. B.*, 466 F.2d 380, 388 (D.C.Cir. 1972) (emphasis added).

The Supreme Court has pointedly hinted that an administrative agency, as much as possible, should exercise its "ability to make new law prospectively through the exercise of its rulemaking powers" and be less prone "to rely upon *ad hoc* adjudication to formulate new standards of conduct." *Securities & Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947). Both this court in *Retail, Wholesale and Department Store Union, supra,* and the Second Circuit in *N. L. R. B. v. Majestic Weaving Co.*, 355 F.2d 854, 860 (2d Cir. 1966), have taken occasion to remind administrative agencies of the Supreme Court's admonition.

We find neither a legal basis nor an equitable justification under these circumstances—where final Commission action on the preliminary permit in question was taken well in advance of the Commission's adoption of its new regulations, and where the new regulations were promulgated in formal rulemaking proceedings pursuant to statute—to warrant a remand to explain why the subsequent regulations should not be retroactively applied.

remand to be without merit and to involve a misconstruction of a *post hoc* regulation, 18 C.F.R. § 4.35.[2]

Moreover, even if the Commission had retroactively applied the new regulations, it does not appear that a different result would have eventuated. The dissent asserts that retroactive application *probably* would have resulted in Dothan receiving the "first-in-time" preference. *Dis. Op.* at 166. However, it later retreats from that position by claiming that the Commission "has been utterly silent" about whether the outcome would have been different under the new regulations. *Dis. Op.* at 166 n.4. Without attempting to decide an issue not expressly addressed by the Commission, we simply look to the plain language of the new regulation, 18 C.F.R. § 4.35, and the accompanying Commission comments, *see* 46 Fed.Reg. 55249 (Nov. 9, 1981), for authoritative guidance.

Subsection (b)(2) of 18 C.F.R. § 4.35, is the pertinent provision here. It limits the definition of a "material amendment to a plan of development proposed in an *application for preliminary permit*" (emphasis added), that changes the location or size of the dam, the location of the powerhouse or the size and elevation of the reservoir, *only if* such "changes would *enlarge, reduce or relocate the area of the body of water* between the farthest reach of the proposed impoundment and the point of discharge from the powerhouse to be affected by the proposed project." (Emphasis added). Georgia's pending application does not embody such "changes."

This record indicates that the applications of both Dothan and Georgia sought to use the *existing* Andrews Lock and Dam on the Chattahoochee River and the *existing impoundment.* The "Description of the Proposed Project" that accompanies Dothan's "Application for Preliminary Permit," for example, contains a section listing measurements of the *"Existing Reservoir,"* such as its length, normal full pool elevation, and total volume at static full pool. (App. 119–120.) The Army Engineers also stated in their comments to the Commission, analyzing Georgia's and Coop's competing applications for the Andrews Lock and Dam Project, that the "[p]rimary purposes of the [existing] Andrews project [are] to provide navigable depths to W. F. George Lock and Dam located upstream and to regulate power waves caused by peaking operations at the W. F. George powerhouse." Brief of Commission at Addendum A1. Accordingly, the Army Engineers reserved the right to "execute special operations . . . to *prevent exceeding the static-head limitations* at either Andrews or W. F. George." *Id.* at A2 (emphasis added). These statements indicate that the hydroelectric power facility that both proposed to engraft on the Andrews Dam would not alter the existing lock and dam or the dimensions of the "existing reservoir." Do-

On March 27, 1981, the Director of the Commission's Office of Electric Power Regulation (the Director), acting pursuant to authority delegated him by the Commission, issued a preliminary permit to Georgia and denied the competing applications. (App. 44–53.) The Director determined that the proposals of Georgia and Dothan were both equally well adapted to achieving the public interest purposes of the Federal Power Act, and therefore awarded the preliminary permit to Georgia because its application was filed prior to that of Dothan. Article 11 of the preliminary permit specifically directed that Georgia coordinate the studies for the proposed project with the Army Engineers. (App. 49.)

On May 27, 1981, the Commission issued an Order Denying Dothan's Appeal and affirming the decision of the Director. (App. 72–76.) The Commission explained that be-

cause applications for preliminary permits deal with flexible and speculative plans it did not strictly hold applicants to their initial plans. The Commission considered the applications of Georgia and Dothan together as competing applications and concluded that the differences between Georgia's and Dothan's proposals reflected "not a different scheme of development but rather a different level of refinement and specificity." (App. 73.) The Commission concluded that Georgia was not *required* to file a statement rebutting Dothan's asserted claims of having a superior proposal.[3] Finally, the Commission held that it had fully complied with the rationale of *Ashbacker Radio Corp. v. FCC*, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), which requires that the Commission consider competing applications together, because the applications of Dothan and Georgia were consolidated and considered together. (App. 75.)[4]

than's application was to be limited by the "existing reservoir" and Georgia's was interpreted to be limited to the existing "static-head limitations." We have found nothing in this record to suggest that any change in the location of the powerhouse or the estimate of available head would "enlarge, reduce or relocate the area of the body of water between the farthest reach" of the *existing* impoundment and the point of discharge at the powerhouse. *See* 18 C.F.R. § 4.35(b)(2). Since Georgia's application *always* has been limited by the *existing dam*, the change in the location of the powerhouse and the correction of the *estimate* of the available head did *not* constitute a change in the expected elevation of the impounded water or the resulting energy output. Under such circumstances, even if the new regulation were applied retroactively—which for reasons set forth above it should not be— there is no indication in this record that Georgia's application would lose its priority.

It is thus clear that under the new regulation Dothan's proposal would not be a "clearly better adapted plan of development" and that Georgia's modification of its application did not constitute a material amendment thereof that would cause it to lose priority. The Georgia changes would not be "considered a material amendment" under the new regulation because they did not amount to "changes ... of such a fundamental nature as to constitute the proposal of a different project." *Id.* (emphasis added). It is obvious that the Georgia changes did not implicate changes of the character that would constitute a "different project" under the later regulations. And since the changes would not require a shift in priority under the

new regulation there is no reason to rule that a different result would be required under the regulations in existence when the Commission ruled. In matters involving the exercise of judgment as to what is material in an application for license or permit, and what is not, the Commission's judgment is entitled to a very considerable deference.

3. Dothan had argued that Georgia was *required* to submit a rebuttal responding to Dothan's competing application and its statement attacking the adequacy of Georgia's proposal. That contention is incorrect. The Commission's regulations permit, but do not require a rebuttal.

18 C.F.R. § 4.33(e) (1981) provides:

(e) No later than 30 days from the date of service of a copy of a competing application, the applicant that filed the initial application for the site in question *may* file a response that:

(1) Rebuts the competing applicant's statement that it has equally well adapted or better adapted plans; and

(2) Provides a detailed and complete counterstatement of how the plans reflected in the initial application are equally well adapted or better adapted to develop, conserve, and utilize in the public interest the water resources of the region.

(Emphasis added).

4. The Commission noted that although the *Ashbacker* rationale was applicable here, it was not required thereby to hold a joint hearing on the applications since the applicants in *Ashbacker* had a statutory right to a hearing

## II.

■ The rule is clear that judicial review of agency action is narrow. The provisions of the Administrative Procedures Act, 5 U.S.C. § 706(2)(A), (E), require a reviewing court to set aside agency action found to be arbitrary, capricious, an abuse of discretion or unsupported by substantial evidence. Accordingly, the role of this court is not to make its own independent assessment as to whether one of the two competing applications is superior, rather our role is to consider whether the Commission's determination that the plans of Georgia and Dothan are equally well adapted to the public interest objectives of the Act is supported by substantial evidence. If substantial evidence supports the determination that the two competing applications are equally well adapted, then our inquiry ceases.

The record shows that Georgia did alter its proposal in two respects: the site of the powerhouse and the available head estimate. Both Georgia and Dothan attach wholly different significance to those changes. The Commission and Georgia assert that Georgia's changed plans represent only a modification of its original application—an expected and acceptable occurrence in the initial planning stages. Georgia further claims that once those changes were made no significant differences remained to distinguish the two proposals; therefore, as the first applicant to file it was properly awarded the preliminary permit.

Dothan, on the other hand, contends that Georgia's change in position represents an abandonment of its original proposal. Brief of Petitioner at 9, 18. Dothan also implies that Georgia used information disclosed by the competing applicant, Dothan, to cure the deficiencies in its proposal so as to make the two applications equally well adapted. Brief of Petitioner at 18.

■ The Commission applied the wealth of its experience in hydroelectric projects and found that the differences in the two

whereas Part I of the Federal Power Act does not provide the same right in this case. (App.

applications reflected "not a different scheme of development but rather a different level of refinement and specificity." (App. 73.) Both parties planned to build powerhouses on the same *already constructed dam*, using basically the same kind of generators. In the initial application the location of the powerhouse and the estimate of the available head—although important considerations—were not deemed by the Commission to be controlling factors in determining the relative superiority of the two proposals. In view of the Commission's very considerable expertise in hydroelectric matters, including handling applications for permits, and in view of the statutory discretion with which it is vested, we cannot conclude on the record before us that the Commission acted arbitrarily, capriciously or abused its discretion.

The Commission's decision is supported by substantial evidence. First, the Commission stressed that the preliminary permit stage is an exploratory period, often characterized by modifications resulting from the acquisition of fuller information:

> The purpose of a preliminary permit is to study the feasibility of the project and to crystalize those factors which at the permit application stage may have been uncertain. Project features are subject to modifications based upon information developed during the preliminary permit studies. Therefore, at the preliminary permit stage, the plans of the applicants must be considered both flexible and speculative.

(Footnotes omitted) (App. 73.).

Second, this is not a case in which Georgia "pirated" ideas from Dothan to cure deficiencies in its proposal. Dothan's proposal was based in large measure on studies of the Army Engineers. "Application of City of Dothan, Alabama for Preliminary Permit" (App. 114, 119.); *see* Brief of Petitioner at 14. The information about optimal powerhouse site and the available head

75 n.10.)

originated with the Army. (App. 119.) Because it was anticipated from the outset that whichever applicant was successful in obtaining the preliminary permit would work closely and "coordinate their studies" with the Army Engineers,[5] and because this implicit expectation was made an express condition of the preliminary permit (App. 49.), we believe that it was reasonable for the Commission to conclude that both applicants proposed "essentially the same scheme of development." (App. 73). Questions about powerhouse location and available head were found to be but refinements that would be resolved satisfactorily in essentially the same manner in conjunction with the Army Engineers by either party. The record confirms that the refinements about the powerhouse site and available head were made prior to the issuance of the preliminary permit. For these reasons, the Commission's order is affirmed.

*Judgment accordingly.*

MIKVA, Circuit Judge, dissenting:

Federal Energy Regulatory Commission (FERC) regulations that govern the grant of preliminary permits for hydroelectric development ostensibly favor the applicant whose plans are better adapted "to conserve and utilize in the public interest the water resources of the region." 18 C.F.R. § 4.33(g)(1) (1981). If FERC concludes that competing applications are "equally well adapted" to advance these objectives, however, it breaks the tie by granting the preliminary permit to the applicant that filed

first. *Id.* § 4.33(g)(2). Although I agree that FERC's application of these regulations to particular situations must be upheld if the agency's decisions are supported by substantial evidence, such evidence is entirely lacking in this case. Instead, the record now before us paints a dismal picture of an agency so understaffed or swamped by work that it appears to be institutionally incapable of giving all but the most obvious problems the attention required by law. Because FERC's reasons for awarding the preliminary permit to MEAG rather than Dothan smack of a reflexive application of the "first-in-time" rule, I cannot join the majority's decision.

A brief review of the facts illustrates the difficulties involved in affirming FERC's action in this case. MEAG filed a permit application in March 1979 for the *east* side of the Chattahoochie River, basing its project design on a gross miscalculation of the potential elevation of the water behind the dam (the "head"). In December 1979, Dothan filed a competing application for the same site[1] that differed from MEAG's in two material respects. Dothan's application was for the *west* side of the river, and assumed an average head of 14 to 16 feet rather than the 24 feet contemplated by MEAG. In May 1980, MEAG implicitly agreed that Dothan's proposal was superior; it now proposed to locate its powerhouse on the west side of the river, and reduced its calculation of the available head and the energy production capability of the project.[2] Notwithstanding these concessions—which meant that almost nothing of MEAG's orig-

---

5. *See* Brief of Commission at Addendum A1–A4.

1. Although the majority opinion observes that Dothan filed the competing application "over nine months after [MEAG's] application," maj. op. at 3, Dothan had a longstanding interest in the site, and had commissioned engineering and feasibility studies that were completed as early as 1977. *See* Joint Appendix (J.A.) 11–16, 58.

2. The majority opinion ignores Dothan's objections to the way in which MEAG made these concessions. MEAG did not attempt to rebut Dothan's competing application within thirty days, *see* 18 C.F.R. § 4.33(e) (1981), but instead filed a protest to *Dothan's* application and thus

exceeded the thirty-day time limit by several months. Moreover, as Dothan emphasizes and the majority opinion intimates, the literal effect of this end-run procedure is that part of MEAG's proposal has been abandoned, but not yet replaced with a new proposal. Although it is settled FERC policy that an incomplete application will be rejected, *see, e.g., Northeastern Minnesota Municipal Power Agency*, 16 FERC ¶ 61,033 (1981); *Sun Ventures, Ltd.*, 15 FERC ¶ 61,015 (1981), at the time this case was argued MEAG had not yet filed the amended project map or revised project description that would seem to be required by 18 C.F.R. §§ 4.31, 4.32 (1981).

inal proposal remained intact—FERC found that MEAG's application "as originally filed" was essentially equivalent to Dothan's. In language strikingly similar to that used in numerous other cases, the Commission stated that because the two proposals were "equally well adapted under the criteria that are appropriate at the preliminary permit stage," it would grant the permit to MEAG because MEAG's application was "first in time." Order, 15 FERC ¶ 61,168 (1981), Joint Appendix (J.A.) 74–75.

There are three independent reasons to doubt that FERC's "findings" were anything more than empty boilerplate. The first is empirical: in 120 comparable instances canvassed by Dothan, FERC has *never* granted a preliminary permit based on the "better adapted" approach of 18 C.F.R. § 4.33(g)(1), and has *always* relied on the mere matter of filing date and the "first-in-time" approach of 18 C.F.R. § 4.33(g)(2).[3] When the tie-breaking rule is invoked in each and every case, one must conclude that FERC's definition of a "tie" is somewhat extraordinary.

The second reason is the inference suggested by FERC's recent revision of its regulations governing preliminary permit applications. *See* Order No. 183, 46 Fed. Reg. 55,245 (Nov. 9, 1981) (17 FERC ¶ 61,-083). Under the new regulation, 18 C.F.R. § 4.35, material amendments to an application for a preliminary permit will change the date of acceptance of the permit to the date on which the amendment is filed. Had FERC applied this regulatory change retroactively, MEAG's "material amendments" to its application would probably have given the "first-in-time" preference to Dothan.[4] The new regulation seems commendable; what is shocking is FERC's bald explanation for the change:

> In the case where an applicant that did not file first-in-time *nevertheless has a clearly better plan of development* and its competitor then seeks to utilize those ideas to make its plan equally well adapted, fairness militates against allowing the first-filed application to retain its priority in-time for its amended application.

*Id.,* 46 Fed.Reg. at 55,249 (emphasis added). If the second applicant truly has "a clearly better plan of development," the question of filing date should be absolutely irrelevant; FERC has no reason to invoke the "tie-breaking" rule of section 4.33(g)(2) if one application is "better adapted" under section 4.33(g)(1). The regulatory change essentially constitutes an admission that FERC prefers to grant preliminary permits by virtue only of filing date. The change

---

**3.** *See* Brief for Petitioner Dothan (Dothan Brief) at 19, Adden. 43–47. FERC does grant preliminary permits based on statutory preferences, of course. For example, the Commission is required to favor applications from states and municipalities. *See* maj. op. at 3. The court has been informed of only two decisions, other than those turning on the statutory preference in favor of local governments, in which a preliminary permit was awarded to the second applicant to file. *Marsh Island Hydro Associates,* 16 FERC ¶ 61,236 (1981); *City of Ukiah, California,* 18 FERC ¶ 61,108 (1982). In both cases, however, the second applicant held a license or contractual rights to a related site that could not be disturbed under the statute, and thus these cases also turn on a form of statutory preference rather than analysis of what is "better adapted" to promote the public interest. Indeed, even these decisions reflect FERC's apparent belief that there should be a presumption in favor of the initial applicant. *See City of Ukiah,* 18 FERC ¶ 61,108 at 4 (explaining why second applicant is better qualified "in this instance").

**4.** The new regulation defines a material amendment to a permit application as "a change in the location or size of the dam, the location of the powerhouse, or the size and elevation of the reservoir, any of which changes would enlarge, reduce, or relocate the area of the body of water between the farthest reach of the proposed impoundment and the point of discharge from the powerhouse to be affected by the proposed project." 18 C.F.R. § 4.35(b)(2), *published at* 46 Fed.Reg. 55,251 (Nov. 9, 1981). FERC has been utterly silent about whether "the outcome would have been different" under this regulation, *but see* maj. op. at 162 n.2. If MEAG's revision of the powerhouse location, expected elevation of the water behind the dam, and expected energy output do not constitute "the proposal of a different project," *see id.,* then what would? I agree with the majority that the Commission and not the court must make this judgment; I simply suggest that the Commission has apparently failed to do so.

as to how the filing date will be determined, although apparently motivated by "fairness," would be unnecessary if FERC made the effort to determine which applications were better adapted in the first place.

Finally, FERC has structured its administrative procedures in such a way that there is every incentive to grant permits based on filing date rather than on the quality of the competing applications. In Order No. 132, 46 Fed.Reg. 14,119 (February 13, 1981), the Commission delegated to the Director of the Office of Electric Power Regulation (OEPR) the authority to grant preliminary permits if competing applicants "do not propose and substantiate materially different plans." *Id.* at 14,120. This order does *not* give the OEPR Director authority to grant permits under more complex circumstances, however; that task is for the Commission. In other words, a finding that projects are essentially equal is purely ministerial, and the permit will be awarded to the applicant that filed first; a finding that the second application is "better adapted" cannot even be made at the OEPR level. As a result, the deck is stacked in favor of initial applicants. Even a passing familiarity with the administrative process suggests the unlikelihood that a field director will burden his overworked home office when he can terminate a matter within his own authority, even if one-sidedly. The biases inherent in FERC's approach are further demonstrated by the "background" discussion in Order No. 132, which explains that the purpose of this delegation of authority to the OEPR Director is to clear FERC's

backlog of competing preliminary permit applications.

It is true, as FERC noted below when it granted the permit to MEAG, that the Commission's rules "are grounded in both public interest considerations and a pragmatism necessary in light of the unprecedented increase in permit applications, adding to a case load that must be handled with limited resources." Order, May 27, 1981, at 4, J.A. 175. Courts must respect and defer to agency efforts to deal with scarce resources and clogged dockets—but not to the extent of permitting agencies to ignore their own regulations.[5] Ultimately, of course, these concerns also must raise doubts about how well FERC fulfills its statutory responsibilities under Part I of the Federal Water Power Act, 16 U.S.C. §§ 791a *et seq.*, to promote development of the nation's water resources in the public interest. The central and still unanswered question here concerns the relevance of a preliminary permit to the Commission's *licensing* of water projects under section 7 of the Act, 16 U.S.C. § 800(a). FERC's statements in this regard have been consistently murky and often contradictory. Commission counsel stated during the oral argument of this case that preliminary permits have little ultimate import because "competition lives on. Dothan can come in with a better license application and ultimately win the license regardless whether the permit is granted to MEAG or not." This contention, which seems mandated by the competitive licensing scheme contemplated by Congress in section 7 of the Act, has not been proven.[6] More important, the conten-

---

5. If FERC's processing of preliminary permit applications is as mechanical as Dothan alleges, then the agency has made a nullity of other regulations as well. 18 C.F.R. § 4.33(d)(2) (1981), for example, requires that a second applicant explain why its plan is better adapted than the proposal of the initial applicant. These applicants too have demands on their time. FERC would do better to explain its administrative processes candidly, rather than requiring applicants to file "better adapted" statements that may never be read. FERC emphasizes that the purpose of the first-in-time rule is to save other applicants the cost and time of preparing a competing application unless they can demonstrate a better plan of de-

velopment. Brief for Respondent FERC at 20. If Dothan's allegations are correct, however, the agency's regulations only create the expensive illusion that a non-statutorily preferred applicant can *ever* succeed against an initial applicant.

6. FERC submitted a post-argument letter to the court stating that although there are now 945 preliminary permit application dockets of which 332 involve competing applicants, there are 208 license application dockets of which only 25 involve competing applicants. Letter of March 19, 1982. This difference alone suggests that competition at the licensing stage is minimal. Moreover, during oral argument

tion ignores the public interest considerations that Congress expected would be used in granting preliminary permits under the Act.[7]

If the award of a preliminary permit controls the award of the final license, then capriciousness at the first stage means capriciousness at the second. The resulting

FERC counsel suggested that sixty percent of all license applications involve situations in which *no* party held a preliminary permit. As a result, it is possible that none of the 25 contested license applications involves a challenge to the holder of a preliminary permit. Based only on the record before the court, it is entirely possible that granting a preliminary permit is a *de facto* grant of the final license.

7. The Act, with its emphasis on governmental development of hydroelectric sites and limiting the return from such projects earned by private investors, was considered fairly controversial in 1918. Developers of water power projects were viewed as trustees of public resources, and their actions were to be governed by the public interest. Because the Act only authorized the issuance of one permit per site at a time, *see* 56 Cong.Rec. 8931 (1918) (Representative Sims), Congress expected permits to be issued when there "would be a development upon such reasonable conditions as would be just *for the public and for the Government.*" *Id.* at 9773 (Representative Dempsey) (emphasis added); *see id.* (Representative Anderson) (preliminary permit "is for the benefit of the Government and for the benefit of the individual"). FERC does not have any "statutory discretion" in this regard. *Compare* maj. op. at 164 *with* 56 Cong.Rec. 9805 (1918) (Representative Humphreys) (although statute says commission "may" give preference to better adapted permit applications, "the word 'may' is construed to mean 'shall' ").

FERC has consistently minimized its ability to distinguish between projects at the preliminary permit stage. *See, e.g., Town of Madison Electric Works Dep't,* 11 FERC ¶ 61,318 at 61,-673 (1980) ("To determine with any confidence that one of these two [permit] applicants has plans better than the other's to conserve and utilize in the public interest the available water resources, we would·have to have the results of the detailed studies and analyses to be conducted under the permit itself"); Order No. 183, 46 Fed.Reg. at 55,249 ("the proposals submitted at [the preliminary permit] stage of conceptualization are seldom so altogether different from one another as to permit a clear judgment to be made on the merits, rather than on first-in-time"). Even if this is true, perhaps the applicants should be encouraged to refine their proposals until such a determination can be made. There is no apparent basis in the Act for FERC

detriment to the public interest should be self-evident. I would remand this case for FERC to explain (i) why the OEPR Director should be able to grant the initial application but not subsequent ones; (ii) why the new regulations governing "material amendments" to permit applications should not be given retroactive effect; [8] (iii)

to solve this problem by arbitrarily closing off one applicant's efforts merely because the other applicant enjoys an earlier filing date.

8. The majority opinion states that this would be "pointless since prospective application of the regulations is directed by statute," *i.e.,* the Administrative Procedure Act, 5 U.S.C. § 551(4) (1976). Maj. op. at 162 n.2. This suggestion seems unwarranted, for three reasons. First, even so-called "legislative" rules may be applied retroactively, when the regulation simply articulates what is required by reasoned decisionmaking. *See, e.g., Greene v. United States,* 376 U.S. 149, 162–64, 84 S.Ct. 615, 622–23, 11 L.Ed.2d 576 (1964); *Central Power & Light Co. v. United States,* 639 F.2d 1104, 1106 (5th Cir. 1981), *cert. denied,* 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 108; *Hicks v. Califano,* 600 F.2d 1048, 1050 (4th Cir. 1979). "[A] court reviewing an agency decision following an intervening change of policy by the agency should remand to permit the agency to decide in the first instance whether giving the change retrospective effect will best effectuate the policies underlying the agency's governing act." *NLRB v. Food Store Employees,* 417 U.S. 1, 10 n.10, 94 S.Ct. 2074, 2080 n.10, 40 L.Ed.2d 612 (1974). *See generally* K. Davis, Administrative Law Text § 5.05, at 133 (3d ed. 1972). Second, the promulgation of new regulations does not turn an agency's application of the underlying statute into retroactive rulemaking. *See, e.g., Chrysler Corp. v. EPA,* 631 F.2d 865, 889 (D.C.Cir.), *cert. denied,* 449 U.S. 1021, 101 S.Ct. 589, 66 L.Ed.2d 483 (1980). The adoption of regulations that clarify what the language of the statute was intended to convey "is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand." *Manhattan General Equipment Co. v. Commissioner,* 297 U.S. 129, 135, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936). Finally, notwithstanding the formal rulemaking procedures used by FERC, the regulation is clearly more "interpretive" than "legislative," because it is a general statement of administrative policy rather than a standard of conduct "issued pursuant to legislatively-delegated power to make rules having the force of law." *Joseph v. Civil Service Comm'n,* 554 F.2d 1140, 1153 n.24 (D.C.Cir.1977); *see generally U.S. Chamber of Commerce v. OSHA,* 636 F.2d 464, 468 (D.C.Cir.1980). As an interpretive rule

whether FERC does automatically apply the "first-in-time" rule; and (iv) the consequences that granting preliminary permits on such an arbitrary basis have for the ultimate licensing of water projects. As this court observed in *Connecticut Light & Power Co. v. FERC*, 627 F.2d 467, 473 (D.C. Cir.1980), "reciting only nonexplanatory boiler plate" cannot possibly substitute for the reasoned administrative decisionmaking required by law. The majority opinion refers to "the wealth of [FERC's] experience in hydroelectric projects." Maj. op. at 164. Based on the record now before us, however, that experience might better be described as bankrupt.

I respectfully dissent.

that corrects what is arguably FERC's erroneous prior understanding of the statute, it is manifestly unjust *not* to give the regulation retrospective effect. The substance of what the agency has done, and not the label it attaches to the rule, is of course dispositive in judging whether a regulation is "interpretive" or "legislative." *CBS, Inc. v. United States*, 316 U.S. 407, 416, 62 S.Ct. 1194, 1200, 86 L.Ed. 1563 (1942).