**CITY OF UKIAH, CALIFORNIA,**
Petitioner,

v.

**FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,**

Sonoma County Water Agency,
Intervenor.

Nos. 83–1114, 83–1181.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 2, 1983.

Decided March 6, 1984.

Robert A. O'Neil, Washington, D.C., with whom Frederic Lee Klein, Washington, D.C., was on the brief, for petitioner.

Joshua Z. Rokach, Atty., F.E.R.C., Washington, D.C., with whom Stephen R. Melton, Acting Gen. Counsel, and Thajauna D. Miller, Atty., F.E.R.C., Washington, D.C., were on the brief, for respondent.

George A. Avery, Washington, D.C., with whom Suzan D. Hatfield, Deputy County Counsel, Santa Rosa, Cal., Janet M. Robins, and Patricia Sharin Flagg, Washington, D.C., were on the brief, for intervenor.

Before WRIGHT and TAMM, Circuit Judges, and LUTHER M. SWYGERT,* Senior Circuit Judge for the Seventh Circuit.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

Petitioner, City of Ukiah, appeals the Federal Energy Regulatory Commission's (the Commission) issuance of a permit to Sonoma County Water Agency to study the feasibility of operating a hydroelectric generating plant. Petitioner asserts both substantive and procedural objections to the Commission's decision. Because we find the Commission's decision procedurally sound and supported by substantial evidence on the record as a whole, we affirm.

## I. BACKGROUND

The City of Ukiah (Ukiah) applied to the Commission on May 27, 1980 for a "preliminary permit" to study the possibility of operating a hydroelectric generating plant at Warm Springs Dam.[1] Sonoma County Water Agency (Sonoma), intervenors in this action, applied for the same permit on August 25, 1980. Under the Commission's regulations, the first-filed applicant is to be awarded the permit unless a subsequent applicant demonstrates an advantage in generating potential.[2] Here, the Commission found that Sonoma had demonstrated a capacity to produce substantially more electricity than Ukiah. Accordingly, the Commission awarded the permit to Sonoma.[3]

The Commission's conclusion that Sonoma could generate significantly more electricity than Ukiah at Warm Springs Dam rests primarily on a contractual relationship between Sonoma and the Army Corps of Engineers (the Corps). In 1964, Sonoma entered into a contract (1964 contract) with the Corps to purchase three blocks of water storage space in the reservoir (Lake Sonoma) behind Warm Springs Dam. Joint Appendix (J.A.) 649–60.[4] Most important for this case, the contract also gave Sonoma discretion to direct releases and regulate the use of stored water. J.A. 509, 653, 658.

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1976).

**1.** The purpose of the preliminary permit is to allow the recipient to maintain priority of application for a license. The permit also allows the recipient to make such examinations, surveys, and financial arrangements as are necessary to determine project feasibility and to prepare an application for a license. 16 U.S.C. § 798 (1982).

**2.** The Commission's regulations require that it award the permit to the first-filed applicant unless a subsequently filed candidate (1) has a statutory preference (i.e., state or municipal agencies), or (2) can demonstrate that its plan is better adapted to the comprehensive development of the waterway. 18 C.F.R. § 4.33(g) (1983). Both Ukiah and Sonoma have a statutory preference as municipalities. The inquiry here is thus limited to whether substantial evi-

dence supports the Commission's finding that Sonoma's plan for power generation is better adapted than Ukiah's plan for power generation.

**3.** The proposed hydroelectric plant would be constructed at the Warm Springs Dam, west of Geyersville, Sonoma County, California. The Warm Springs Dam is being built at the confluence of Dry Creek and Warm Springs Creek, both tributaries of the Russian River. Due north of the Warm Springs Dam on the Russian River is the Coyote Dam at Lake Mendocino. Sonoma controls water releases from the Coyote Dam and would thus be able to coordinate releases from both Dams to maximize the development of the waterway system. Brief for Intervenor at 4.

**4.** The Joint Appendix (J.A.) has a dual pagination system. All page numbers referred to in this opinion correspond to the "Record Page Numbers" in the J.A.

In its initial decision, the Commission found that Sonoma, by virtue of "its authority to direct water releases from [Warm Springs Dam], has demonstrated ... the ability to produce substantially more power ... than ... Ukiah." *City of Ukiah,* 18 FERC (CCH) ¶ 61,108, at 61,204 (1982) (Order Issuing Preliminary Permit and Denying Competing Application). The Commission also acknowledged Sonoma's claim that if it generated electricity at Warm Springs Dam, it would release excess water to increase power production. *Id.* at 61,203. Since there is a cost associated with releasing stored water, Sonoma noted that it would promote power generation only if it, and not Ukiah, received the benefits from the project.[5] J.A. 71–72. Consequently, the Commission concluded that "Sonoma's control of water releases from Warm Springs Dam ... uniquely qualifies Sonoma as a superior applicant for a preliminary permit." *Id.*

Ukiah applied for a rehearing of this order on March 12, 1982.[6] In its application, Ukiah argued that if Sonoma released water for power generation, Sonoma would be required to begin repayment of the project's costs. Ukiah thus asserted that even if Sonoma's contract with the Corps allowed Sonoma to release water for power generation, there would be a significant economic disincentive discouraging such releases.

In October 1982, following the issuance of the Commission's initial order, Sonoma and the Corps signed an amended contract (1982 contract). In the new contract, Sonoma agreed to purchase a fourth block of storage space and to begin paying the Corps for each block in 1993, 1996, 2001, and 2006 respectively, regardless of when consumptive use begins. J.A. 347–48; *see id.* at 511, 514. Also, Sonoma retained its

discretion to direct releases from the Warm Springs Dam reservoir. J.A. 344–45. In considering Ukiah's rehearing application, the Commission noted that the 1982 contract "severs the relationship between payback of the project's costs and actual use of the stored water." *City of Ukiah,* 21 FERC (CCH) ¶ 61,133, at 61,361 n. 2 (1982) (Order Denying Rehearing). The Commission determined that since Sonoma could release water without triggering its repayment obligation, no economic disincentive would discourage Sonoma from releasing stored water for power generation before the water was needed for consumption. *Id.* at 61,361. The Commission thus concluded that Sonoma had the "operational flexibility" regarding water releases to produce significantly more power at the dam than Ukiah, and rejected Ukiah's rehearing application. *Id.* at 61,361 n. 2.

On January 26, 1983, the Commission rejected Ukiah's second application for rehearing essentially for the same reasons that it granted Sonoma the permit in its initial decision. *City of Ukiah,* 22 FERC (CCH) ¶ 61,063 (1983) (Notice Rejecting Application for Rehearing and Reconsideration). Ukiah has appealed the Commission's denials of rehearing as well as its initial issuance of the permit to Sonoma. Ukiah asserts that the Commission's issuance of the permit is not supported by substantial evidence and is procedurally flawed. After full consideration, we find that the Commission's decision is substantively and procedurally sound. Accordingly, we affirm.

## II. UKIAH'S SUBSTANTIVE CLAIM

■ Ukiah contends that the Commission's decision to grant Sonoma the permit was not supported by substantial evidence. Ukiah disputes the Commission's finding

---

5. The cost of releasing stored water is the reduction in the reliability and quantity of consumptive water supply and the sacrificing of recreational interests at the reservoir. Brief for Intervenor at 9 n. 10; J.A. 71–72. Recreational interests are compromised to the extent that the reservoir pool is lowered by water releases. The cost related to reduction of water supply

would rise over time as Sonoma County's demand for water supply increased. *Id.*

6. The Commission granted rehearing only for further consideration. J.A. 246. This allowed the Commission more than the ordinary period of 30 days to consider a party's application for rehearing. 18 C.F.R. § 385.714(f) (1983).

that Sonoma's contractual relation with the Corps gives Sonoma a comparative advantage in power generation. Ukiah argues instead that both applicants can produce essentially the same amount of power and that it, as the first-filed applicant, therefore deserves the permit.

Sonoma's contract will afford it an advantage in power generation if three conditions exist. First, Sonoma must have excess water in its storage space that could be released for nonconsumptive purposes. Second, the contract must give Sonoma the discretion to release its stored water for nonconsumptive purposes. Third, there must be no significant economic disincentive discouraging Sonoma from releasing its stored water for nonconsumptive purposes.

The first condition is an empirical concern and may be disposed of briefly. All parties to this litigation agree that Sonoma County probably will not require consumptive use of Sonoma's stored water until the 1990's. The last block of Sonoma's stored water is not scheduled for use until approximately 2010. J.A. 64. Thus, for about twenty-five years at least a portion of the stored water will be available for nonconsumptive releases.[7]

The second two conditions require an examination of Sonoma's contract and the Water Supply Act of 1958, 43 U.S.C. § 390b (1976) (Water Supply Act). Both inquiries may be considered questions of law. *Danks v. Fields*, 696 F.2d 572, 575 (8th Cir.1982) (interpretation of a written document is question of law). We therefore are not limited to, and do not employ, the deferential arbitrary and capricious standard in reviewing these issues of law. *Office of Communication of United Church of Christ v. FCC*, 707 F.2d 1413, 1422–23 n. 12 (D.C.Cir.1983).

Implicit in the Commission's decisions that Sonoma's contractual relations allowed it to produce more power than Ukiah is the view that the 1964 and 1982 contracts permitted Sonoma to direct water releases for nonconsumptive purposes. 18 FERC (CCH) ¶ 61,108, at 61,203–04; 21 FERC (CCH) ¶ 61,133; 22 FERC (CCH) ¶ 61,063. We review this finding only with regard to the 1982 contract which superseded the 1964 contract.[8] Article 1(b)(2) of Sonoma's 1982 contract gives Sonoma "the right to withdraw water from the lake, or to order releases ... by the Government ... subject to ... Article 1(c) and to the extent of water the aforesaid storage space will provide ...." J.A. 344. In Article 1(c), the government in turn reserves the right to control Sonoma's discretion to release its stored water essentially for four purposes:

---

**7.** Ukiah argues that certain stream minimum and maximum flow requirements and Corps operating criteria for Warm Springs Dam prevent Sonoma from releasing its idle stored water in an *arbitrary* fashion. Brief for Petitioner at 53–55; Reply Brief for Petitioner at 13. Sonoma concedes as much. Sonoma argues, however, and the Commission apparently concluded, that within the flow requirements and operating criteria, Sonoma still has sufficient discretion in controlling releases to significantly affect the amount of power generated at the Dam. Brief for Intervenor at 31–32 & n. 26; J.A. 70–72, 621; City of Ukiah, 18 FERC (CCH) ¶ 61,108, at 61,203–04 (1982). We find no reason to reject this position. *See City of Dothan v. FERC*, 684 F.2d 159, 164 (D.C.Cir.1982) (acknowledging and deferring to the Commission's "very considerable expertise" in hydroelectric matters).

**8.** Ukiah argues it was error for the Commission even to consider the 1982 contract because it was signed after the Commission's initial decision on February 12, 1982. Brief for Petitioner at 47–52. The updated 1982 contract was supplemental information bearing on the correctness of the Commission's initial decision. It was therefore proper for the Commission to consider the 1982 contract in reviewing Ukiah's application for rehearing. We will not place blinders on the Commission when relevant factual information is at its disposal. *Webb v. Gorsuch*, 699 F.2d 157, 161–62 (4th Cir.1983) (courts permit an agency to seek new evidence without reopening comment period); *Williams v. Robinson*, 432 F.2d 637, 642 & n. 17, 643 (D.C.Cir.1970) ("[o]ccasionally, developments subsequent to the administrative determination may warrant the presentation of additional factual material"). Moreover, the Commission accepted comments from Ukiah on the proposed 1982 contract and its potential violations of the Water Supply Act of 1958, 43 U.S.C. § 390b (1976) (Water Supply Act); J.A. 310–12; *see infra* Section III. B.

(1) flood control, (2) to meet authorized Project purposes such as maintenance of the Dam and fish population, (3) to preserve life and/or property, and (4) to ensure the repayment provisions of the contract are consistent with the Water Supply Act.[9] J.A. 345. The contract, by its terms, does not prevent Sonoma from releasing stored water for nonconsumptive purposes. We see no reason to require the Commission to read into Sonoma's contract a prohibition against releases for nonconsumptive purposes generally or for power generation specifically.[10] We therefore sustain the Commission's finding that Sonoma's contract gives it the discretion to release its stored water for nonconsumptive purposes, including power generation.

Finally, we address the Commission's conclusion that there is no economic disincentive that discourages Sonoma from releasing its excess water for power generation. As noted earlier, the Commission found no economic disincentive because the 1982 contract does not directly link Sonoma's repayment schedule with the actual date Sonoma first uses its stored water.[11] *See supra* p. 795. Ukiah argues, however, that even if no economic disincentive derives from the 1982 contract, the Water Supply Act requires repayment upon Sonoma's release of stored water for power generation.[12] Ukiah's argument is based on section 390b(b), which provides in pertinent part:

> [T]he entire amount of the construction costs … allocated to water supply shall be repaid within the life of the project but in no event to exceed fifty years after the project is first used for the storage of water for water supply purposes, except that (1) no payment need be made with respect to storage for fu-

**9.** Article 1(c) of the 1982 contract provides:

(c) *Rights Reserved.* The Government reserves the right to lower the water in the Project to elevation 451 feet above mean sea level during such periods of time as are deemed necessary, in its sole discretion, for flood control purposes; to control and use any future water supply storage space for which repayment of principal is not provided herein; and to maintain at all times minimum downstream releases through the gates as required to meet authorized Project purposes. The Government further reserves the right to take such measures as may be necessary in the operation of the Project to preserve life and/or property, including the right not to make downstream releases during such periods of time as are deemed necessary, in its sole discretion, to inspect, maintain, or repair the Project, and to prohibit any withdrawals of water from the lake, or any releases through the outlet works that would cause the repayment provisions of this contract to be inconsistent with any provision of the Water Supply Act of 1958.

J.A. 345.

**10.** In several memoranda from the Corps to the Commission, the Corps itself at least implied that the 1982 contract permitted releases for nonconsumptive purposes. J.A. 327, 514, 557, 568.

**11.** The Water Supply Act provides that initial repayment for water supply storage need not be made "until such supply is first used." 43 U.S.C. § 390b(b)(1). It also requires that all payments for the water supply storage be completed with-

in 50 years of the date storage for water supply begins. 43 U.S.C. § 390b(b). Article V of the 1982 contract adheres strictly to the 50-year payback requirement and effectively to the initial repayment clause. While initial repayment may occur after the water supply is actually used for consumptive purposes, the fixed repayment schedule was drawn to reflect precisely the parties' best mathematical estimates of when consumptive use would actually begin. J.A. 511.

The commander of the San Francisco district for the Corps asserts that this arrangement is consistent with § 390b(b)(1) of the Water Supply Act. J.A. 514. The Commission apparently agreed, as it cited the fixed repayment schedule as the basis for rejecting Ukiah's argument that the release of stored water would trigger Sonoma's repayment obligation under § 390b(b)(1). We express no opinion on the legality of the fixed repayment schedule for reasons stated *infra* note 12.

**12.** Ukiah also argues that the 1982 contract is illegal under the Water Supply Act because the contract separates Sonoma's repayment obligation from its use of water even for water supply purposes. Since the dispute before us concerns the use of stored water only for power generation (a nonconsumptive use), we need determine only whether the Water Supply Act requires Sonoma to begin repayment upon first use of the water for *nonconsumptive* purposes. We therefore need not decide in this case whether the 1982 contract, by separating repayment from first use of the water for *consumptive* purposes, violates the Water Supply Act.

ture water supply until *such supply is first used,* ....

43 U.S.C. § 390b(b) (emphasis added). Ukiah contends that Sonoma's release for power generation would constitute "first use of such supply," and thereby trigger Sonoma's initial repayment obligation. Brief for Petitioner at 61–69.

Sonoma, on the other hand, argues that section 390b(b)(1) refers to the first use of stored water *for consumptive purposes* only. Any other reading, Sonoma argues, would render the provision unduly restrictive. That is, if release of the stored water for nonconsumptive purposes triggered the repayment obligations, then releases for flood control, recreation, or downstream fish would bring heavy financial burdens upon Sonoma. The Commission implicitly agreed with Sonoma's position when it concluded, after considering Ukiah's arguments, that Sonoma's releases for power generation would not trigger repayment.

Sonoma's view of section 390b(b)(1) is supported both by the language and the context of the provision. The ambiguity in the text lies with whether the last two words of section 390b(b)(1) refer to use of the stored water for *any* purpose whatsoever: "(1) no payment need to be made with respect to storage for future water supply until such supply is *first used.*"

(Emphasis added). We believe that "first use" refers only to use for consumptive purposes. Our view derives from the fact that the Water Supply Act continually links repayment for storage space with use of the project *for purposes of water supply.* [13] For instance, immediately preceding the disputed phrase, the statute provides that the fifty-year repayment period will not begin to run until the water is first stored *for water supply purposes,* as opposed to storage for any purpose. [14] Section 390b(b)(1) itself speaks of first use of "storage *for future water supply,*" not storage generally. This implies, we believe, that "first use" refers to the time when stored water is released for supply purposes and not for nonconsumptive purposes. [15] In sum, we find no evidence that Congress wished to tie initial repayment to use generally and not to use for consumption.

This reading promotes the purpose of section 390b(b)(1) as indicated by its context. Section 390b(b) requires repayment for the construction of storage reservoirs for consumptive water supply within fifty years of the "plant-in-service" date. [16] Subsection (1) of section 390b(b) eases the burden of repaying such construction costs within fifty years by providing that repayment need not begin until the stored water is used for its primary purpose of consump-

---

**13.** "Project use" refers to the overall operation of the dam and reservoir. "Storage" refers to the accumulation of water in the acre-footage purchased by a local interest from the federal government.

**14.** The legislative history supports our reading of the Water Supply Act. In a previous version of this Act, Congress explicitly rejected tying repayment *to* the availability *of* the project for storage generally. H.R. REP. No. 1588, 85th Cong., 2d Sess. 32 (1958). (Conference report accompanying S. 497, 85th Cong., 2d Sess. § 205 (1958)). Section 205 of S. 497 was the counterpart to § 390b(b). Though S. 497 was vetoed, 104 CONG.REC. 6,389 (1958), § 205 of S. 497 was the basis for § 390b(b)(1).

**15.** The Senate Report on the Water Supply Act confirms the accuracy of the Commission's reading of § 390b(b)(1):

Arrangements are made [in § 390b(b)] for deferral of initial repayment of costs allocated

to water-supply storage until storage [*i.e.,* stored water] is first used <u>for this purpose</u> and for final repayment of such costs within the life of the project and not to exceed 50 years from the date of first use [of the project] for water supply.

S.REP. No. 1710, 85th Cong., 2d Sess. 133 (1958) (emphasis added). The underscored phrase, "for this purpose," can refer only to "water supply." Thus, the Senate Report indicates that § 390b(b)(1) requires initial repayment only upon first use of stored water for water supply purposes. The disputed language of the bill was not addressed in the subsequent House Conference Report. H.R. REP. No. 1982, 85th Cong., 2d Sess. 30 (1958).

**16.** The "plant-in-service" date is the date the project becomes "physically available to initiate deliberate impoundment for water supply purposes." J.A. 354.

tion. We will not read subsection (1) to increase Sonoma's financial burdens by *accelerating* its repayment obligation upon releases for nonconsumptive purposes.

In short, section 390b(b)(1) does not require Sonoma to begin paying for its storage space when it releases water for nonconsumptive purposes, including power generation. The Water Supply Act therefore imposes no economic disincentive that would discourage Sonoma from making discretionary releases of its stored water for power generation.[17]

We thus conclude that Sonoma has excess stored water to release for power generation, that Sonoma's contract allows it to release stored water for power generation, and that no severe economic disincentive would discourage Sonoma from making these releases.[18] Given these three conditions, we find substantial evidence to support the Commission's conclusion that Sonoma's "contract provides [it] with the operational flexibility to enhance power generation at the dam in amounts significantly greater than Ukiah." 21 FERC (CCH) ¶ 61,133.

## III. UKIAH'S PROCEDURAL CLAIMS

Ukiah asserts a host of procedural objections to the Commission's disposition of its application. Brief for Petitioner at 37–59. After giving each objection full consideration, we find that none has merit. Indeed, we believe only two of Ukiah's procedural claims warrant discussion. These claims concern Ukiah's asserted right to a hearing and its allegation that the Commission made unlawful extra-record communications.

### A. *Ukiah's Asserted Right to a Hearing*

■ Ukiah argues that having "demonstrated the flaws in Sonoma's claims of superiority ... it was incumbent upon the Commission to hold an evidentiary hearing to further test and illuminate the factual predicate for those claims...." Brief for Petitioner at 37–38. Ukiah does not assert that its right to a hearing grows out of a regulation, statute, or the Constitution. Rather, Ukiah cites the judicially defined principle requiring the Commission to provide an adversarial hearing when genuine issues of material fact are in issue. *Public Service Co. of New Hampshire v. FERC*, 600 F.2d 944, 955 (D.C.Cir.), *cert. denied*, 444 U.S. 990, 100 S.Ct. 520, 62 L.Ed.2d 419 (1979); *Mobil Oil Corp. v. FPC*, 483 F.2d 1238, 1259–60 (D.C.Cir.1973). Even this principle, however, has been qualified: "[M]ere allegations of disputed facts are insufficient to mandate a hearing; petitioners must make an adequate proffer of evidence to support them." *Cerro Wire & Cable Co. v. FERC*, 677 F.2d 124, 129 (D.C.Cir.1982). *See also Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524–25, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978).[19]

Ukiah has been unable to specify any disputed issues of material fact. Ukiah does allege generally that Sonoma's receipt of the permit was unsupported by substantial evidence. In Section II, however, we found that the basis of the Commission's decision consisted of contractual and statu-

17. The Corps or the Commission could charge whichever applicant is awarded the license a "head charge" for use of the stored water for power generation. J.A. 336. Such a charge, however, would impose the same burden on Sonoma and Ukiah regardless of any pre-existing contractual relations with the Corps. Thus, the head charge is irrelevant in determining whether Sonoma's contractual relations with the Corps would *uniquely* discourage it from nonconsumptive releases.

18. Indeed, Sonoma would have an economic incentive to withhold discretionary nonconsumptive releases if it is not awarded the power generation license. The economic incentive here, as discussed *supra* note 5, is avoidance of the costs associated with such releases.

19. Sonoma argues that the Commission need not hold an oral hearing even when material issues of fact are in dispute, so long as submission of written material is adequate to resolve the dispute. Brief for Intervenor at 53 & n. 41 (citing *Amador Stage Lines, Inc. v. United States*, 685 F.2d 333, 335 (9th Cir.1982)). Since we find no material issue of fact in dispute, we need not reach this point.

tory interpretation. Both issues here are questions of law that do not require an oral hearing for proper resolution. We are thus required to affirm the Commission's decision that a hearing was not necessary in this case.[20]

### B. Extra-Record Communications

Ukiah also claims it was denied due process when the Commission's staff counsel orally requested and received information about the 1982 contract from Sonoma and the Corps. Specifically, Ukiah objects to three filings by Sonoma in response to oral requests for a copy of, and comments on, the proposed 1982 contract between Sonoma and the Corps. Ukiah also objects to a request by the Commission's staff counsel to the Corps for a copy of the final 1982 contract and accompanying comments. Ukiah further alleges it was error for the Corps to file the requested information.

■ Ukiah's main brief cites no statutory or regulatory provision violated by the Commission. Indeed, when we examine the Commission's regulations governing ex parte contacts and responses thereto, we find the Commission's activities well within

its regulatory bounds. The communications with the Corps are exempt from the prohibitions on ex parte contacts under 18 C.F.R. 385.2201(b)(1) (1983). Since the Corps is a federal agency that has no official interest in this proceeding, it qualifies as an interceder. Id.[21] The prohibitions regarding ex parte contacts are therefore not applicable to communications from the Corps.

■ Additionally, the three communications between Sonoma and the Commission's staff counsel were not unlawful. All the disputed filings were served on Ukiah when they were submitted to the Commission. Brief for Intervenor at 61; J.A. 247A, 286, 328, 366. Ukiah subsequently submitted responses to these filings. J.A. 287–309, 310–12. Thus, the disputed submissions by the Corps and Sonoma were not, in any real sense, ex parte. We respect the staff counsel's communication with Sonoma and its consideration of Ukiah's responses as a lawful inquiry necessary to an informed decision.[22]

### IV. CONCLUSION

We therefore find the Commission afforded Ukiah due process in its disposition

---

**20.** Ukiah makes some reference to a material issue of fact existing with regard to computer studies on potential power generation submitted by Sonoma. The studies were submitted to the Commission pursuant to 18 C.F.R. § 4.33(d)(2) (1983). The studies calculated the amount of power generation that would result from incidental water releases and the amount that would be produced if the dam were used to maximize power generation. The Commission duplicated the studies to check their accuracy. The Commission did not assume that Sonoma could produce the amount of electricity that would result if the dam were used to maximize power generation. Rather, the Commission concluded only that generating potential could vary significantly according to the amount of stored water released. 21 FERC (CCH) ¶ 61,-133. See also 18 FERC (CCH) ¶ 61,108 at 61,-203.

Even if the Commission's consideration were somehow found erroneous, the error would not be prejudicial. The Commission explicitly accorded the studies only secondary importance and had wholly independent bases to support its decision. 21 FERC (CCH) ¶ 61,133. See Consolidated Gas Supply Corp. v. FERC, 606 F.2d 323, 329 (D.C.Cir.1979), cert. denied, 444 U.S. 1073,

100 S.Ct. 1018, 62 L.Ed.2d 755 (1980) (error not reversible if independent basis for decision exists); Chrysler Corp. v. FTC, 561 F.2d 357, 362–63 (D.C.Cir.1977) (reversal not warranted if procedural error is not prejudicial).

**21.** The ex parte exemptions provide in pertinent part:

(b) The [ex parte communication] prohibitions contained in paragraph (a) of this section do not apply to a communication:

(1) From an interceder who is a local, State, or Federal agency which has no official interest in and whose official duties are not affected by the outcome of the on-the-record proceedings before the Commission to which the communication relates. . . .

18 C.F.R. § 385.2201(b)(1) (1983).

This regulation also protects comments submitted by the Corps on the relative merits of Ukiah's and Sonoma's competing applications before the Commission's initial decision.

**22.** We do note, however, that it would have been preferable for the Commission's staff counsel to communicate his requests for supplemental information in writing and to serve copies of those requests on both parties.

of Ukiah's application. Having also found the Commission's decision to be supported by substantial evidence on the record as a whole, we accordingly affirm the Commission's awarding the preliminary permit to Sonoma.

*Affirmed.*