James M. HAGOOD, Plaintiff–Appellant,

v.

SONOMA COUNTY WATER AGENCY,
Defendant–Appellee.

No. 95–16092.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 15, 1996.

Decided April 15, 1996.

Lauren Cabot, The Law Firm of Cabot and Farrell, Denver, CO, for plaintiff-appellant.

Vernon I. Zvoleff, Kenneth P. Conour, Preuss Walker & Shanaghey, San Francisco, California, for defendant-appellee.

Before: HUG, Jr., Chief Judge, SNEED and KLEINFELD, Circuit Judges.

Opinion by Judge SNEED; Concurrence by Judge KLEINFELD.

SNEED, Circuit Judge:

This is an appeal by qui tam plaintiff James M. Hagood from the district court's grant of summary judgment in favor of the Sonoma County Water Agency in his action under the False Claims Act, 31 U.S.C. §§ 3729–3733.[1] Hagood's action has its source in the construction of the Warm Springs Dam on Dry Creek, a tributary of the Russian River in northern California, and a 1982 amended contract by which the Sonoma County Water Agency ("the Water Agency") agreed to repay the United States for the water supply component of the cost of building the dam. Thus, Hagood's action is a "reverse false claim": he alleges not that the Water Agency fraudulently overbilled the United States, but that it fraudulently induced the United States to underbill it. Hagood contends on appeal that the district court erred by (1) finding that it lacked subject matter jurisdiction over his claim concerning the fixed repayment schedule; and (2) granting summary judgment in favor of the Water Agency on his cost allocation claim. The Water Agency submits that the district court lacked subject matter jurisdiction over both claims.

This is Hagood's second trip to this court. On his first trip, we held that his complaint stated a claim under the False Claims Act, and reversed the district court's 12(b)(6) dismissal. *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416 (9th Cir.1991). This time, with more evidence in hand, we hold him to the higher standard required to survive summary judgment.

The district court had jurisdiction under 31 U.S.C. §§ 3729–3733, unless the claims were barred under 31 U.S.C. § 3730(e)(4), a disputed issue on appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291. We now affirm the grant of summary judgment.

## I.

*BACKGROUND OF HAGOOD'S CLAIMS*

It all began when Congress authorized construction of the Warm Springs Dam by the United States Army Corps of Engineers ("the Corps") in the Flood Control Act of 1962, Pub.L. 87–874, 76 Stat. 1180. The project's authorized purposes were flood control, recreation, and water supply. To the latter purpose a storage capacity of 132,000 acre-feet[2] was allocated. Under the Water Supply Act of 1958, 43 U.S.C. § 390b, the

---

**1.** The False Claims Act provides for the recovery of civil penalties from those who knowingly present a false or fraudulent claim to the federal government for payment, or knowingly use a false record to avoid or decrease an obligation to pay the federal government. 31 U.S.C. § 3729(a)(1),(7). The Act's qui tam provisions allow an individual to bring a civil action on behalf of himself as well as the government, and to share in any penalty recovered. *Id.* § 3730(b),(d). The Act was first enacted in 1863 "in order to combat rampant fraud in Civil War

defense contracts." S.Rep. No. 345, 99th Cong., 2d Sess. 8 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5273. It was substantially amended and strengthened in 1986 because of rising government fraud, especially in the areas of defense contracting and health care benefits. *Id.* at 2–4, 1986 U.S.C.C.A.N. at 5267–69.

**2.** An acre-foot is the volume of water that covers an area of one acre to a depth of one foot, about 43,560 cubic feet. *The American Heritage Dictionary* (3d ed. 1992).

local interests who benefit from the water supply component of federal projects, such as Warm Springs, are to shoulder the portion of construction costs allocated to that purpose.[3] Costs allocated to federal purposes like flood control and recreation are to be borne by the federal government. The local sponsor for the Warm Springs project was the Sonoma County Flood Control & Water Conservation District, later renamed the Sonoma County Water Agency.

Accordingly, in 1964 the Water Agency signed a contract with the Corps to use and repay the cost of water supply storage created by the Warm Springs Dam and its reservoir, Lake Sonoma. The contract defined three 44,000 acre-foot blocks of water storage space, use and repayment of which was to begin in 1979, 1985, and 1991, respectively. In the contract, the Corps allocated to water supply storage 30% of the total construction cost, or $12,433,500.

*The Expanded Warm Springs Project*

In 1967, before significant construction had begun, the Corps prepared a General Design Memorandum ("GDM") which envisioned an expanded Warm Springs Dam project with a water supply storage capacity of 212,000 acre-feet, an increase of 80,000 acre-feet. In the GDM, the Corps reevaluated the breakdown of costs and adjusted the cost allocation for water supply storage downward to 27.76%. Despite the lower allocation, a higher price tag of $20 million was assigned to water supply storage because of the project's expansion and rising construction costs.[4] The Corps asked for the Water Agency's assurances that it needed and would pay for the additional storage, and the Water Agency agreed. In 1969, the Corps approved the project "optimization" and reported it to Congress.

*The Cost Allocation Question*

In early 1974, while the dam was still under construction, the U.S. General Accounting Office conducted an inquiry into the Warm Springs project and concluded that delays in project completion called into question the validity of the cost allocation.[5] In response, the Corps acknowledged that de-

---

3. The Water Supply Act, before it was amended in 1986 by Pub.L. 99–662, Tit. IX, § 932(a), 100 Stat. 4196, stated in relevant part:

> In carrying out the policy set forth in this section, it is hereby provided that storage may be included in any reservoir project surveyed, planned, constructed or to be planned, surveyed and/or constructed by the Corps of Engineers or the Bureau of Reclamation to impound water for present or anticipated future demand or need for municipal or industrial water ...: *Provided*, That the cost of any construction or modification authorized under the provisions of this section shall be determined on the basis that all authorized purposes served by the project shall share equitably in the benefits of multiple purpose construction, as determined by the Secretary of the Army or the Secretary of the Interior, as the case may be: *Provided further*, That before construction or modification of any project including water supply provisions for present demand is initiated, State or local interests shall agree to pay for the cost of such provisions in accordance with the provisions of this section: *And provided further*, That not to exceed 30 per centum of the total estimated cost of any project may be allocated to anticipated future demands where State or local interests give reasonable assurances, and there is reasonable evidence, that such demands for the use of such storage will be made within a period of time which will permit paying out the costs allocated to water supply within the life of the project[.]

43 U.S.C. § 390b(b). The water supply component of Warm Springs was entirely for future supply.

4. This figure continued to grow as total costs grew, so that the cost finally estimated for water supply in the 1982 amended contract was $96,624,900.

5. The GAO's regional manager, A.M. Clavelli, wrote to the Corps' district engineer in San Francisco, Col. James L. Lammie:

> Early in the project formulation during the 1960's, it was assumed the municipal and industrial water supply benefits would not be derived until about 10 years after the expected project completion in about 1970. Therefore, the benefits assigned to water supply were discounted at the project interest rate (3⅛ percent) for a 10–year period. This in turn reduced the percentage and amount of project costs allocated to water supply: the only reimbursable project purpose.
>
> With the delays experienced, it now appears the initial use of water specified for in the contract will coincide with project completion at about the year 1980. In our opinion, the changed situation makes questionable the continued use of the premise upon which cost allocation was based.
>
> We believe you should consider reallocation of project costs based upon the current situation.

lays and the increased storage space in the expanded project made a new cost allocation necessary, but explained that this would be performed when firm cost figures became available, "about four years from now." However, in a letter to the Water Agency later in 1974, the chief of the Corps' Engineering Division in San Francisco, H.E. Pape, Jr., wrote that "[t]he percentage of cost allocated to the water supply feature is 27.76% as established in the approved General Design Memorandum. This percentage will remain unchanged regardless of any changes made in the project's first [i.e. construction] cost."

The confusion over the cost allocation resurfaced several years later, when the Water Agency and the Corps began negotiating an amended contract to reflect the project's expansion. The primary negotiators were Robert F. Beach, General Manager of the Water Agency since 1980, and Capt. Scott Mosely of the Corps' San Francisco district. In April 1981, Capt. Mosely sought guidance from Corps headquarters on how to proceed in view of the project's expansion. In response, L.H. Blakey, Chief of the Planning Division at Corps headquarters, noted that "[a] new cost allocation is required," but that "[t]he above guidance cannot be taken as official Office, Chief of Engineers views."

Apparently, Mosely and Beach then agreed that Beach would submit a draft of the proposed amended contract, which Beach did on October 1, 1981. The draft included the 27.76% allocation and a handwritten figure of $122,018,700 for the cost allocated to water supply. In a cover letter, Beach pointed out that he had "included a cost estimate which you may wish to modify."

Mosely and Beach then met to discuss the draft in November 1981. Also at that meeting was appellant Hagood, who was an Assistant District Counsel in the Corps' San Francisco district and had been assigned the task of drafting the new contract. According to Hagood, he and Mosely went into the meeting with questions about the figures Beach had included in the draft. Beach responded by showing them the Pape letter:

> At that time, Mr. Beach pulled out a letter from Mr. Pape.... Mr. Beach explained that the figures, the percentage figure that he was using in his contract, proposed contract, was the same figure that Henry Pape had sent to Mr. Beach's predecessor, Mr. Miller.

Mosely and Hagood, who had been unaware of this letter, told Beach they would "look into this."

When the two returned to San Francisco after the meeting, Hagood asked the engineering branch about the cost allocation. He was told by an assistant chief of engineering in the San Francisco district that a cost allocation would not be done for the enlarged project. Greatly concerned, Hagood wrote two file memos in November 1981, and a letter to the District Engineer, Colonel Paul Bazilwich, Jr., on March 25, 1981, opining that the Water Supply Act required "a new allocation based on accurate and current costs."[6] Hagood refused to participate in drafting the contract. According to Hagood,

> if a current and accurate cost allocation was performed, [the Water Agency's] repayment obligation would increase at least $60 million over its cost allocation based on the inaccurate 1967 GDM. Thus [the Water Agency's] cost share may be over $145 million rather than the approximately $86 million based on the 27% total repayment obligation.

Steve Lingenfelter, who was then District Counsel for the San Francisco District, wrote a memo to the file disputing Hagood's interpretation of the Water Supply Act and arguing:

> Colonel Bazilwich considered all staff comments regarding the cost allocation issue. It was ultimately his decision, after a thorough review and evaluation of all aspects of that issue, that preparation of a new cost allocation was not mandatory.

---

6. Hagood also challenged the draft contract on other grounds that he does not pursue in this action. His second claim in this action, that the contract fails to tie commencement of repayment to the Water Agency's first use of the project, was not raised in his 1981 and 1982 correspondence.

In April 1982, Hagood left the San Francisco District for Alaska; in 1987, he retired from the Corps.

The cost allocation controversy continued to percolate within the Corps, however. On September 13, 1982, James P. Oppenheim, Assistant Director of Civil Works, Pacific, wrote to the Commander of the Pacific Division that

> In accordance with paragraph 2–5b of ER 1105–2–40 [an internal Corps regulation], dated 8 January 1982, an updated preliminary cost allocation study is required. This cost allocation must be approved before an accompanying water storage contract can be submitted to the Secretary of the Army for approval.... Corps policy on this item ... is to adjust contract costs to only reflect actual construction costs and not to reflect change in cost allocations.

On September 27, 1982, Edward M. Lee, Jr., who had replaced Colonel Bazilwich as District Engineer, wrote to the Commander of the South Pacific Division that "the cost allocation set forth in Table II of Exhibit 'A' to the executed contract is the current updated project cost allocation based upon the project and the authorized project purposes."

Finally, on September 30, 1982, the contract was forwarded for final Corps approval to Assistant Secretary of the Army William Gianelli, accompanied by a memo from Brigadier General Forrest T. Gay, III, who noted:

> Regulations require an updated preliminary cost allocation as a basis for this cost-sharing contract. The expedited schedule for review and approval of this contract directed by your office did not allow time for this new cost allocation to be developed.

Despite this observation, Gay recommended Gianelli sign the contract. On a "routing and transmittal slip" attached to the contract and memo, a handwritten note stated:

Corps *policy* requires a preliminary cost allocation schedule to be prepared before contract is signed. This is not a legal necessity. It will take 3–6 months to develop a new schedule. Decision made by OCE [Office of Chief Engineer] staff to waive policy.

On October 1, Gianelli signed the contract.

*The Fixed Repayment Schedule Question*

While enlargement of the dam raised cost allocation issues, the possibility of conjunctively operating Lake Sonoma and another dam and reservoir upstream of Warm Springs raised repayment timing issues.[7] Coyote Dam and Lake Mendocino are located on the east fork of the Russian River above the confluence of Dry Creek with the river. Because the two facilities are part of the same river system, operating them conjunctively would, according to Water Agency correspondence on the issue, help "to maintain minimum flows in the Russian River and Dry Creek and to optimize beneficial uses of water for water supply, fish, wildlife and other purposes." Such conjunctive management would involve making some releases from Lake Sonoma that would ordinarily be made from Lake Mendocino, in order to maintain higher water levels in the latter.

In 1978, before negotiations on the amended contract began, the Water Agency and the California Department of Fish & Game ("Fish & Game") began exploring this possibility. Concerned that releasing water from Lake Sonoma under this scheme would prematurely trigger repayment on its Warm Springs Dam obligations, Gordon W. Miller, Beach's predecessor at the Water Agency, asked the Corps for its opinion. In response, John M. Adsit, then District Engineer in San Francisco, acknowledged the Water Agency's concern, and offered to circumvent the problem by performing a monthly "routing" of the river system. The idea behind the routing methodology was that repayment on the

---

7. The timing of repayments on the Water Agency's obligation was significant because of a provision of the Water Supply Act that stated:
 > [T]he entire amount of the construction costs, including interest during construction, allocated to water supply shall be repaid within the life of the project but in no event to exceed fifty years after the project is first used for the storage of water for water supply purposes, except that (1) no payment need be made with respect to storage for future water supply *until such supply is first used....*

 43 U.S.C. § 390b(b) (emphasis added).

Warm Springs obligation would be triggered only when the "routing" showed that had the releases from Lake Sonoma been made instead from Lake Mendocino, the available water supply in Lake Mendocino would have been exhausted.[8] The parties agreed on the need for conjunctive management, but the routing methodology was soon abandoned as too complex. Yet, its introduction influenced the course of negotiations over the repayment terms in the new contract.

When the Water Agency and the Corps began negotiating the new contract in August 1980, the draft contract added a fourth block of 80,000 acre-feet to the three blocks in the original contract. Fixing the dates on which repayment for each block would begin was a major sticking point. This was because conjunctive operation of Lakes Sonoma and Mendocino made it difficult to determine when, absent conjunctive operation, actual first use of each block of water in Lake Sonoma would occur. The solution settled upon was to adopt fixed repayment start dates for each block which were, in turn, based on "triggering studies" prepared by the Water Agency to predict hypothetical dates of first use.[9] Thus, the repayment schedule, set forth in the margin,[10] called for payments for the four blocks to commence in 1992, 1995, 2000, and 2005, respectively, regardless of when first use of each block actually began. The total water supply storage cost, including interest, of $96,624,900 was to be repaid by the year 2042, 50 years from the anticipated "plant-in-service" date of 1992.

Whether the adoption of fixed repayment start dates complied with the terms of the Water Supply Act was soon disputed both within the Corps and without. In 1980, while the contract negotiations were proceeding, the Water Agency had become involved in a dispute with the City of Ukiah ("Ukiah") over their competing applications to the Federal Energy Regulatory Commission ("FERC") for a preliminary permit to investigate the development of hydropower facilities at Warm Springs Dam. The FERC granted the permit to the Water Agency on the basis of its contract with the Corps, which allowed it to control releases from the Warm Springs Dam. Ukiah then submitted a petition for rehearing which alleged that the fixed repayment schedule in the proposed amended contract violated the Water Supply Act because it decoupled commencement of repayment from actual first use of the water. This petition was denied and Ukiah then filed a petition for review in the D.C. Circuit Court of Appeals. In *City of Ukiah v. F.E.R.C.*, 729 F.2d 793, 799 (D.C.Cir.1984), the D.C. Circuit held that "section 390b(b)(1) [of the Water Supply Act] does not require Sonoma to begin paying for its storage space when it

8. Adsit's letter stated in pertinent part:

> To see if existing supplies of water [in the Russian River] are adequate, the Corps will perform a monthly water supply routing of the Russian River system, assuming that Lake Sonoma was not in existence, at the end of every calendar year. When the routing indicates that Lake Mendocino would have been drawn down below the bottom of the water supply pool at the end of any month, [the Water Agency] will be directed to commence full repayment of costs associated with the first, or subsequent blocks of water from Lake Sonoma (as set forth in existing contracts).

9. One of the Corps' lawyers proposed that repayment on a given block could begin earlier than the fixed date if an earlier actual first use were later determined. The Water Agency protested that given the complexity of determining when "first use" occurred, this solution too might inadvertently trigger repayment obligations. As an alternative, the Water Agency proposed to include a savings clause, to which the Corps' attorneys agreed. That clause in the final contract reads:

> The Government further reserves the right ... to prohibit any withdrawals of water from the lake, or any releases through the outlet works that would cause the repayment provisions of this contract to be inconsistent with any provision of the Water Supply Act of 1958.

10.

| Date repayment begins | Block of water supply storage | Amount of repayment |
|---|---|---|
| 1992 | Block 1 (44,000 AF) | $16,831,889 (principal) $ 3,222,336 (interest) |
| 1995 | Block 2 (44,000 AF) | $16,831,889 (principal) $ 3,222,336 (interest) |
| 2000 | Block 3 (44,000 AF) | $16,831,889 (principal) $ 3,222,336 (interest) |
| 2005 | Block 4 (80,000 AF) | $31,603,434 (principal) $ 5,858,791 (interest) |
| Totals | 212,000 AF | $96,624,900 |

releases water for nonconsumptive purposes, including power generation." The court declined to reach the question whether the same was true for consumptive purposes, including water supply. *Id.* at 797 n. 12. The court noted, however, that Ukiah had argued both: "Ukiah also argues that the 1982 contract is illegal under the Water Supply Act because the contract separates Sonoma's repayment obligation from its use of water even for water supply purposes." *Id.*

Internal Corps memoranda from that time indicate confusion over precisely what the Water Supply Act required. The San Francisco district argued that the fixed repayment schedule was legal.[11] The legal office of the Corps headquarters apparently had questions about the schedule's legality up to the end. However, the addition of the savings clause around September 13 appeared to satisfy those concerns.[12] On October 1, Gianelli signed the contract.

*The Role of Political Pressure*

One final wrinkle in this tale must be told in order to understand Hagood's claims. In March 1982, Beach contacted the office of his representative, Congressman Claussen, to request help in shepherding the contract through the Corps' approval process. Beach was put in touch with Paul Reisinger, special counsel to the minority for the Public Works & Transportation Subcommittee of the House Appropriations Committee. Following contacts between Beach and Reisinger, and Reisinger and Gianelli's staff, an internal Corps decision was made to expedite the contract.

On September 9, 1982, Gianelli issued a memo ordering that the contract be expedited for his approval, and on October 1, 1982, he signed the contract.

## II.

### PRIOR PROCEEDINGS

Hagood, following his retirement from the Corps, filed this qui tam action on March 22,

1988, originally naming as defendants two Corps officials as well as the Water Agency. After the district court dismissed the individual defendants, and Hagood filed his third amended complaint, the district court dismissed the case for failure to state a claim. This court reversed and remanded, holding that the complaint stated a claim under the False Claims Act. *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416 (9th Cir.1991) ("*Hagood I*"). After a period of discovery, the Water Agency moved for summary judgment. The district court granted the motion, and Hagood timely appealed.

## III.

### JURISDICTION UNDER THE FALSE CLAIMS ACT

■ We review de novo the lower court's jurisdictional determination. *Hoeck v. City of Portland*, 57 F.3d 781, 784 (9th Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 910, 133 L.Ed.2d 842 (1996). However, we accept the factual findings underlying such determination unless they are clearly erroneous. *United States ex rel. Barajas v. Northrop Corp.*, 5 F.3d 407, 409 n. 5 (9th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1543, 128 L.Ed.2d 195 (1994). Hagood bears the burden of establishing jurisdiction, and all other essential elements of his claim, by a preponderance of the evidence. 31 U.S.C. § 3731(c); *Barajas*, 5 F.3d at 409 n. 5.

### A. *The Fixed Repayment Schedule Claim*

The district court declined to reach the merits of Hagood's claim that the fixed repayment schedule in the 1982 contract amounted to a false claim. The court held that its exercise of jurisdiction over his claim was barred by the public disclosure provision of the False Claims Act. According to that provision:

---

**11.** A July 12, 1982, memo from Edward M. Lee, Jr., District Engineer, states:

Provided the statute's 50 year requirement is met, the District is of the opinion that the 1958 Act does not preclude the establishment of definitive contractual [sic] repayment dates

which may not necessarily correspond to the actual dates of demand.

**12.** Memo from Gary R. Lord, Deputy Commander, South Pacific Division, Sept. 13, 1982; Memo from Brigadier General Gay, Sept. 30, 1982.

(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless ... the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4). The district court held that this provision deprived it of jurisdiction over Hagood's fixed repayment schedule claim because "it is undisputed that the allegation that a fixed repayment schedule violated the Water Supply Act was publicly disclosed in the administrative proceedings and litigation brought by Ukiah."

Hagood primarily contends that the district court erred in its public disclosure determination because (1) Ukiah did not actually allege fraud as he does; (2) there was no actual fraud on the government until the Water Agency began using the storage space without initiating repayments, which did not occur until after the Ukiah litigation was over; and (3) he was the first to allege improper political pressure in aid of the false claim.

■ Before turning to these contentions, we must dispose of Hagood's secondary contention, which is based on the law of the case. Hagood argues that the law of the case prohibited the district court from questioning its jurisdiction, as this court had already ruled in favor of jurisdiction in *Hagood I*. This contention lacks merit. The previous panel addressed only the cost allocation claim, never the fixed repayment claim: "According to

the allegations of the complaint, the Water Agency 'used pressure and influence' to expedite [the contract's] signing without accurate and current cost allocations." *Hagood I*, 929 F.2d at 1418. Indeed, Hagood's fixed repayment schedule claim was not clearly stated even in his third amended complaint. That claim began to take precise shape only on remand, in his opposition to the Water Agency's summary judgment motion before us now.

In addition, there is now, at the summary judgment stage, significant new evidence bearing on the jurisdiction issue that was not before the previous panel on the 12(b)(6) motion to dismiss. The new evidence, discussed below, warranted reconsideration of the question by the district court on remand. *Eichman v. Fotomat Corp.*, 880 F.2d 149, 157 (9th Cir.1989).

#### 1. *Allegations of Fraud.*

This court has held that to raise the jurisdictional bar, the public disclosure must be of "allegations or transactions," as opposed to mere information. *Wang v. FMC Corp.*, 975 F.2d 1412, 1418 (9th Cir.1992). The *Wang* court found there was public disclosure where the qui tam suit was "supported by a few factual assertions never before publicly disclosed; but 'fairly characterized' the allegation repeats what the public already knows." *Id.* at 1417; *see also United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 654 (D.C.Cir.1994) ("Congress sought to prohibit *qui tam* actions *only* when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain."). Thus, the jurisdictional bar may be raised by public disclosure unaccompanied by an explicit allegation of fraud.

■ In this case, there was public disclosure during the Ukiah proceedings of allegations that the fixed repayment schedule violated the Water Supply Act.[13] In the course

---

13. That documents filed with an agency or court during administrative proceedings or civil litigation are considered publicly disclosed is a firmly established principle. *See United States v. Northrop Corp.*, 59 F.3d 953, 966 (9th Cir.1995)

(" 'every court of appeal to have addressed the question' has held that 'any information disclosed through civil litigation and on file with the clerk's office should be considered a public disclosure of allegations in a civil hearing of [sic]

of the FERC proceedings, Ukiah learned of the proposed amended contract between the Water Agency and the Corps, and argued that it would improperly allow the Water Agency to withdraw water without initiating the repayment obligation under the Water Supply Act. Indeed, Ukiah all but accused the Water Agency of fraud in its letters to the Corps, which it also filed with the FERC.[14]

■ When Ukiah lost in the FERC proceedings, it submitted a petition for review in the D.C. Circuit Court of Appeals. Although the controlling issue was whether the Act required initiation of repayment on first use of the water for hydropower generation, a nonconsumptive purpose, rather than for water supply, a consumptive purpose, Ukiah based its argument on both. *See City of Ukiah,* 729 F.2d at 797 n. 12 ("Ukiah also argues that the 1982 contract is illegal under the Water Supply Act because the contract separates Sonoma's repayment obligation from its use of water even for water supply purposes."). An issue need not be decided in prior litigation for the public disclosure bar to be triggered; rather, its mere disclosure suffices. *See Northrop Corp.,* 59 F.3d at 966.

■ Nor has Hagood shown that he is an "original source" of Ukiah's allegations. *See Hagood I,* 929 F.2d at 1420 (original source inquiry triggered only upon finding of public disclosure). To be an original source, one must (1) have direct and independent knowledge of information on which the allegations are based; and (2) have voluntarily provided the information to the government before filing the action. 31 U.S.C. § 3730(e)(4)(B); *United States ex rel. Fine v. Chevron, U.S.A., Inc.,* 72 F.3d 740, 743 (9th Cir.1995) (en banc), *cert. denied,* —— U.S. ——, 116

S.Ct. 1877, —— L.Ed.2d —— (1996). In other words, " 'one must have had a hand in the public disclosure of allegations that are a part of one's suit.' " *Barajas,* 5 F.3d at 410 (quoting *Wang,* 975 F.2d at 1418). Hagood has made no showing that Ukiah's knowledge of the repayment schedule or allegations of its illegality stemmed in any way from Hagood's internal complaints about the contract. Indeed, Hagood's internal complaints in 1981 and 1982 did not mention the fixed repayment schedule issue. Therefore, he was not an original source of this disclosure.

### 2. *Fraud Based on Actual Use.*

■ Hagood, in an attempt to narrow the focus of his claim, contends that the district court's jurisdictional ruling cannot apply to his claim that the Water Agency's fraud began only when it actually used water "because the relevant facts as to the actual water usage without repayment did not occur until after the project had been placed in operation." [15]

Obviously the Water Agency's actual use of water from Lake Sonoma in 1987 or 1988 could not have been disclosed during the Ukiah proceedings in 1982. However, documents filed in those proceedings acknowledged that the Water Agency would be able to do so:

> As to the County having the ability to release water prior to the contractually designated demand dates for the various blocks, and not be obligated to commence repayment for such releases until the contractually designated dates, the District agrees that such a situation could occur under the proposed amended contract. It could also occur that the "Water Agency"

the purposes of section 3730(e)(4)(a)' ") (quoting *United States ex rel. Siller v. Becton Dickinson & Co.,* 21 F.3d 1339, 1350 (4th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994)).

**14.** The record contains, for example, these complaints by Ukiah: "Ukiah also protests Sonoma's attempt to avoid its repayment obligation under the Water Supply Act of 1958, 43 U.S.C. 390b." And again: "Sonoma's intent in negotiating a revised contract is clearly to receive the benefit of the water stored at Warm Springs without

paying for it in accordance with the express directive of the Congress."

**15.** Hagood's claim concerning actual use of the water did not emerge until he filed a brief opposing the Water Agency's motion for summary judgment. However, the district court was correct in reaching the claim, in effect treating it as a request to amend the pleadings. *United States ex rel. Schumer v. Hughes Aircraft Co.,* 63 F.3d 1512, 1524 (9th Cir.1995), *petition for cert. filed,* 64 U.S.L.W. 3593 (U.S. Feb. 15, 1996) (No. 95–1340).

will begin repayment for one or more of the blocks of storage *before* demand is actually made for such storage. However, the District contends neither such occurrence would be in violation of the 1958 Water Supply Act.[16]

An October 3, 1982, article in the Santa Rosa *Press Democrat* also publicly reported the Water Agency's announcement that "the new plan will allow the county to use as much water as it needs as soon as Lake Sonoma is filled, without triggering a higher payment schedule that was called for under the old agreement."

Thus, the public was alerted in 1982 that the new contract embraced the possibility that the Water Agency might begin using water from the Warm Springs project before commencing repayment. Hagood's claim now that the Water Agency did *in fact* begin using the water without making payments amounts to no more than a new factual assertion, which when " 'fairly characterized' ... repeats what the public already knows." *Wang,* 975 F.2d at 1417.

Hagood seeks to negate the effect of the contract by arguing that the Water Agency cannot rely on it to escape its obligation to begin repayments when it first uses the water. In this he is wrong. As the district court correctly observed, "unless the contract itself constitutes a false claim, Defendant may properly rely upon it." Short of offering evidence that the Water Agency's use of the water violated its contract with the Corps,[17] Hagood cannot base jurisdiction on this claim, which "rests on the same foundation as Plaintiff's other repayment claims."

### 3. *Improper Political Pressure.*

■ Hagood contends that he is the first to allege that the Water Agency procured the favorable repayment contract through improper political pressure. This is true.

However, ordinary political pressure, without more, is not a wrong. To the extent it is more, it rests, like the actual use claim, on the same foundation as does his claim that the fixed repayment schedule violates the Water Supply Act. With that claim barred by section 3730(e)(4), Hagood's allegations concerning improper political pressure are also barred.

### 4. *Conclusion.*

Hagood is not a whistleblower with respect to his fixed repayment claim. Through the Ukiah litigation and media reports, the public was made aware in 1982 that the Water Agency and the Corps had negotiated a repayment contract that allowed the Water Agency to begin using water before it began paying for it. Had Hagood raised this issue in his 1981 and 1982 memoranda before he left the Corps, he would have been in a better position to bring this claim. However, he did not. As we stated in *Wang:*

> If, however, someone *republishes* an allegation that already has been publicly disclosed, he cannot bring a *qui tam* suit, even if he had "direct and independent knowledge" of the fraud. He is no "whistleblower." A "whistleblower" sounds the alarm; he does not echo it.

*Wang,* 975 F.2d at 1419 (citing S. Rep. 345 at 6, *reprinted in* 1986 U.S.C.C.A.N. at 5271).

### B. *The Cost Allocation Claim*

Hagood fares better as a "whistleblower" with respect to the issue of the cost allocation. The Corps memoranda which the Water Agency filed with the FERC during the Ukiah proceedings revealed the debate within the Corps over the cost allocation issue. Those filings may be enough to constitute public disclosure of the cost allocation issue.

---

**16.** Memo from Edward M. Lee, Jr., San Francisco District, to Commander, South Pacific Division, Aug. 16, 1982.

**17.** At oral argument, Hagood did indeed seem to argue that the Water Agency was improperly using water from Lake Sonoma for consumptive purposes and hiding this use from the Corps. There is no evidence to support this contention.

There *is* evidence that the contract allows the Water Agency to use water for consumptive purposes, and that it is the Corps which controls the gates that release water from the reservoir. For example, Beach stated in a declaration: "The procedure for making these releases was to request a release from Corps personnel who would then make any releases from the dam."

■ However, even if they were, Hagood was an original source of the allegation.[18] Hagood's complaint about the cost allocation began as early as November 1981, while Ukiah's letters were not filed in the FERC proceedings until July 1982. Moreover, as a Corps attorney he had worked a great deal on the Warm Springs Dam project and was in a position to know its specifications and costs. Because he learned of information relevant to the issue independently of its public disclosure, the first prong of the original source test, direct and independent knowledge, is met. *See Wang,* 975 F.2d at 1417.

He also meets the second prong of the original source test, as he voluntarily provided his superiors in the Corps with an explanation of why he thought a new cost allocation was legally required.[19] Although Hagood was not the only Corps employee to argue that a new allocation was needed, "[a]nyone who helped to report the allegation to either the government or the media would have 'indirectly' helped to publicly disclose it." *Wang,* 975 F.2d at 1419. Therefore, disclosure was at least partially based on records resulting from Hagood's complaints, and the district court correctly held that he was an original source. The jurisdictional bar of section 3730(e)(4) did not preclude this claim. Thus, we must address the issue whether what Hagood now reveals was knowing fraudulent behavior directed at the United States by the Water Agency.

## IV.

### SCOPE OF THE FALSE CLAIMS ACT

We review de novo the grant of summary judgment on the cost allocation claim. *Jesinger v. Nevada Fed. Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994). We approach this issue mindful of the principles governing the granting of summary judgment, which are set forth in the margin.[20]

■ The gist of Hagood's cost allocation claim is that

[The Water Agency] decided to seek the influence of others to avoid current cost allocation.... These events set into place by [the Water Agency] resulted in violation of 31 U.S.C. § 3729(a)(6) and § 3729(a)(7).... In this case, [the Water Agency] had a critical role in inducing the Army Corps to rely on information which [the Water Agency] had reason to know was false.

According to the named provisions of the False Claims Act,

Any person who—

...

(6) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Gov-

---

**18.** The original source test is often treated as the focus of the jurisdictional inquiry, with courts treating the "based upon public disclosure" step as a " 'quick trigger to get to the more exacting original source inquiry.' " *Cooper v. Blue Cross & Blue Shield of Florida, Inc.,* 19 F.3d 562, 568 n. 10 (11th Cir.1994) (quoting *United States ex rel. Precision Co. v. Koch Indus.,* 971 F.2d 548, 552 (10th Cir.1992), *cert. denied,* 507 U.S. 951, 113 S.Ct. 1364, 122 L.Ed.2d 742 (1993)).

**19.** This case is not controlled by our recent decision in *Fine,* 72 F.3d at 741, in which we held that an internal government auditor whose job was to expose fraud did not "voluntarily" provide information for the purpose of qualifying as an original source. Hagood's job was not to expose fraud, but to draft contracts and perform other legal services for the Corps. We acknowledged in *Fine* that the question "whether federal employees might be excluded as a class from qualifying as original sources" remained "for another day." *Id.* at 744 n. 5; *see also United*

*States ex rel. Williams v. NEC Corp.,* 931 F.2d 1493, 1501 (11th Cir.1991) ("nothing in [section 3730(e)(4)(A) ] operates to preclude *every* government employee from bringing a *qui tam* action based upon information acquired in the course of his government employment").

**20.** Summary judgment is appropriate if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact. Once the movant has made this initial showing, the burden shifts to the other party to present sufficient evidence on which a reasonable jury could find for him, on each element of the claim on which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630–32 (9th Cir.1987).

ernment ... who lawfully may not sell or pledge the property; or

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government;

is liable to the United States Government....

31 U.S.C. §§ 3729(a)(6)–(7). Thus, a violation of the False Claims Act requires scienter.[21]

### A. *Falsity of the Cost Allocation.*

 To support an inference of falsity, Hagood observes that the cost allocation in the 1982 contract is based on the same source data as the cost allocation in the 1964 contract despite the expansion and change in design. He also argues that the original allocation was based on a 10–year deferral of water supply benefits and thus a 10–year discounting, whereas the new contract contains at most an 8–year deferral; therefore the percentage of costs allocated to water supply should now be higher.

The evidence concerning the shortened deferral period consists entirely of the 1974 exchange of correspondence between A.M. Clavelli of the General Accounting Office and Col. Lammie of the Corps.[22] These do support an inference that the cost allocation was no longer accurate.

The evidence supporting his expansion and change-of-design argument consists of several Corps memoranda, particularly the one from Brigadier General Gay to Assistant Secretary Gianelli, accompanying the final contract:

> The cost allocation for this project was approved in November 1969. At that time, the benefit breakout was 42% flood control, 27% water conservation, and 31% recreation. The FY 83 justification statement indicates this benefit breakout to the au-

thorized purposes is currently 55% to flood control, 34% to water supply and 11% to general recreation and fish and wildlife. This observation supports an inference that the cost allocation in the amended contract was no longer current. However, General Gay went on to recommend approval, and an accompanying note explained that the update was required by Corps policy, which was being waived. Thus, Hagood's evidence supports an inference that the allocation was imprecise, but not that it was false.

The language of the Water Supply Act concerning allocation of costs among project purposes provides the relevant government officials with fairly wide discretion:

> [T]he cost of any construction or modification authorized under the provisions of this section shall be determined on the basis that all authorized purposes served by the project shall share *equitably* in the benefits of multiple purpose construction, *as determined by the Secretary of the Army* or the Secretary of the Interior, as the case may be.... [B]efore construction or modification of any project including water supply provisions for present demand is initiated, State or local interests shall agree to pay for the cost of such provisions:.... [23]

43 U.S.C. § 390b(b) (emphasis added).

How precise and how current the cost allocation needed to be in light of the statute's imprecise and discretionary language was a disputed question within the Corps. Even viewing Hagood's evidence in the most favorable light, that evidence shows only a disputed legal issue; that is not enough to support a reasonable inference that the allocation was *false* within the meaning of the False Claims Act.

### B. *Knowledge of Falsity.*

 Nor does his evidence meet the scienter requirement of the Act. To estab-

---

21. "For a *qui tam* action to survive summary judgment, the relator must produce sufficient evidence to support an inference of knowing fraud." *United States ex rel. Anderson v. Northern Telecom, Inc.,* 52 F.3d 810, 815 (9th Cir. 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 700, 133 L.Ed.2d 657 (1996).

22. *See supra* note 5.

23. Neither the Corps nor the Bureau of Reclamation has promulgated regulations interpreting this statute. Rather, the Corps developed internal guidelines to inform its own decisionmaking.

lish the type of scienter so required, a relator must show:

> that a person, with respect to information—
>
> (1) has actual knowledge of the information;
>
> (2) acts in deliberate ignorance of the truth or falsity of the information; or
>
> (3) acts in reckless disregard of the truth or falsity of the information,
>
> and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b); *see also Wang*, 975 F.2d at 1420; *Hagood I*, 929 F.2d at 1421 ("The requisite intent is the knowing presentation of what is known to be false."). No such showing has been made. As this court held in Hagood's prior appeal, "[t]o take advantage of a disputed legal question, as may have happened here, is to be neither deliberately ignorant nor recklessly disregardful." *Hagood I*, 929 F.2d at 1421.

Nor has Hagood presently shown any reason to depart from this view. He argues that Beach, the Water Agency's general manager, was sophisticated enough to know that the altered project required an updated cost allocation. In support, he submits a December 14, 1982, memo from Beach to the Sonoma County Administrator discussing a cost-sharing proposal between the federal government and the Water Agency related to recreation facilities at Lake Sonoma. In that memo, Beach stated:

> The cost allocation for the project was made in 1967 pursuant to 43 U.S. 390(b) [sic]. The removal of recreation facilities from the federal project would require a reallocation based on current project costs which could result in a substantial increase in the Agency's repayment obligation.... This is on top of any increases which would result from a reallocation based on actual costs rather than 1967 estimates of cost.

This statement indicates that Beach knew that removing an entire project purpose from the existing cost-sharing contract might require a cost reallocation, and may support a reasonable inference that Beach was sophisticated. However, to jump from there to the conclusion that Beach knew that the cost allocation in the 1982 contract was false is a leap the evidence does not support.

Nor does Hagood's other evidence in the record supply the required knowledge. In the 1974 Pape letter, the Water Agency was told *by the Corps* that no new allocation would be performed. The deposition testimony by Beach's predecessor, Gordon W. Miller, also does not establish the required knowledge. Asked whether he would expect the allocation to change after the project was "optimized," Miller replied, "Not necessarily.... It would depend on how [the Corps] applied the Water Supply Act of 1958 to it.... [I]t could be subject to change. I do not recall that it was ever changed." Miller explained: "The allocation of costs was determined by the Corps, and if I asked somebody to do an analysis, I would have him use the cost percentages as allocated by the Corps." We can now say, as we could not on the basis of the complaint alone, "that the Water Agency did merely what the Corps bid it do." *Hagood I*, 929 F.2d at 1421. Clearly, Hagood's evidence does not support a reasonable inference that the Water Agency caused the Corps to rely on such information as was before it to make the decisions it made.

 The False Claims Act, to repeat, requires a showing of knowing fraud. " 'The requisite intent is the knowing presentation of what is known to be false,' as opposed to innocent mistake or mere negligence. 'Bad math is no fraud,' proof of mistakes 'is not evidence that one is a cheat,' and 'the common failings of engineers and other scientists are not culpable under the Act.' The statutory phrase 'known to be false' 'does not mean "scientifically untrue"; it means "a lie." ' " *Anderson*, 52 F.3d at 815–16 (citations omitted). Likewise, the statutory phrase "known to be false" does not mean incorrect as a matter of proper accounting methods, it means a lie.

Hagood's evidence does not suggest that the Water Agency lied; it suggests only that the Water Agency knew that *the Corps'* responsibility with regard to allocating costs was not clear, and that the Corps might exercise its authority in a number of ways. At most, Hagood has shown that the Water

Agency took advantage of a disputed legal issue. This, as we have previously held, is not enough.

### C. *Improper Political Pressure.*

█ Hagood again refers to political pressure as part of his cost allocation claim. He offers evidence that Beach asked Congressman Claussen for help in getting the contract approved; that after Claussen's assistant met with Corps officials, those officials decided to expedite contract approval; and that because of the expedition, there was no time to prepare a new cost allocation.[24] This chain of events supports a reasonable inference that the Water Agency used political pressure to obtain the contract's approval. It does not establish that the contract so approved was a false claim. Perhaps Congressman Claussen did influence the manner in which the Corps officials exercised their discretion. Perhaps not. In either event, there was no false claim within the meaning of the False Claims Act, 31 U.S.C. §§ 3729–3733.

To vest executive branch officials in a democratic government with discretion in the exercise of their powers is to invite the representatives in the legislative branch of those to be affected by its exercise to present vigorously their constituents' views to such officials. To expect it to be otherwise is foolish; to require it to be otherwise would be tyranny.

### IV.

### *CONCLUSION*

Hagood has presented persuasive evidence that the Corps, in its management of the Warm Springs Dam project, may have been

wasteful, or too eager to build the dam, or been given too much discretion by the statutes governing its operations. He has not, however, established a violation of the False Claims Act by the Sonoma County Water Agency.

The judgment of the district court, including its award of costs to the Water Agency, is AFFIRMED.

KLEINFELD, Circuit Judge, concurring:

I concur in the result, and in the majority's reason, that what Hagood revealed was not fraud.

We err, I think, in deciding that Hagood was an original source who voluntarily provided the information. He was a lawyer charged with the duty of drafting a contract and other documents for the transactions at issue. If he thought the transaction was fraudulent, he was "required to give an honest opinion" to his client, and "may not knowingly assist a client in criminal or fraudulent conduct." Model Rules of Professional Conduct Rule 1.2 cmt. 6 (1995). *See also* Rules of Professional Conduct of the State Bar of Cal.Rule 3–210 (1995) (stating that "[a] member shall not advise the violation of any law ... unless the member believes in good faith that such law ... is invalid"). These professional obligations made disclosure to his agency of fraud mandatory, not voluntary. Therefore, *United States ex rel. Fine v. Chevron, U.S.A., Inc.,* 72 F.3d 740, 741 (9th Cir.1995)(en banc), controls, and prevents qui tam recovery.

In *Fine,* we held that an internal government auditor whose job was to expose fraud did not "voluntarily" provide information. *Id.* at 743–44. The majority states that our decision is not controlled by *Fine* because we

---

24. As the district court observed, the only tangible evidence indicating that the Water Agency may have objected to the preparation of a new allocation was a memo written by a Corps official stating that locals would not support the project if their share of the cost increased. The district court ruled this was likely hearsay; that finding was not an abuse of discretion. *See Larez v. City of Los Angeles,* 946 F.2d 630, 641 (9th Cir.1991) (hearsay ruling reviewed for abuse of discretion). The Water Agency, for its part, submitted a declaration by Beach stating:

I have never expressed any opposition to the preparation of a new cost allocation for the 1982 water supply contract between [the Water Agency] and the United States of America.... I have never had any discussions with anyone connected with Congressman Claussen's office, Mr. Gianelli, Mr. Dawson, Colonel Bauchspies, or Neil Saling concerning the issue of a new cost allocation.... I never told anyone connected with Congressman Claussen's office, nor anyone connected with the Corps, that the [Water] Agency had a deadline for execution of the final contract.

rejected Fine's argument that since *all* federal employees labor under a duty to report fraud against the government, treating his disclosure as involuntary would "bar all federal employees from the universe of potential original sources." *Id.* at 744. In *Fine,* we said that the question "whether federal employees might be excluded as a class from qualifying as original sources" remained "for another day." *Id.* at 744 n. 5.

The issue here is distinct from whether a government lawyer who discovers a fraud in a matter unrelated to his own duties can recover in a qui tam action. Had Hagood heard from a carpool acquaintance about a fraud in some other agency, then the question we left for another day in *Fine* would be before us. But a lawyer working on a transaction has a duty as an agent to disclose to his principal "information relevant to matters within his province and of which he should know the principal would want to know." Warren A. Seavey, *Law of Agency* § 143 (1964). Because Hagood provided the information to his agency pursuant to his legal duty, he did not do so "voluntarily," as 31 U.S.C. § 3730(e)(4)(B) requires for qui tam jurisdiction. Hagood "no more voluntarily provided information to the government than we, as federal judges, voluntarily hear arguments and draft dispositions." *Fine,* 72 F.3d at 743–44.