129 F.3d 128
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, ex rel Larry Rey HILL, Plaintiff-Appellant,
v.
STATE of California; California Department of Education,
Child Development Division, Defendants-Appellees.
 No. 96-17013.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Oct. 9, 1997.
Decided Oct. 23, 1997.
 
 Appeal from the United States District Court for the Northern District of California. Patricia V. Trumbull, Magistrate, Presiding.
 Before: SNEED, SCHROEDER, and BRUNETTI, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Larry Rey Hill appeals the district court's entry of summary judgment in favor of the State of California and the California Department of Education, Child Development Division ("CDE") in Hill's qui tam action under the False Claims Act ("FCA"). We have jurisdiction under 28 U.S.C. §§ 636(c)(3) & 1291 and we review de novo the district court's grant of summary judgment. Hoeck v. City of Portland, 57 F.3d 781, 784 (9th Cir.1995), cert. denied, 116 S.Ct. 910 (1996). We affirm.[1]
 
 I.
 FACTS
 
 3
 Pursuant to the Federal Child Care and Development Block Grant Act of 1990 ("the Act"), Congress allocated approximately $76.5 million in federal block grant ("FBG") funds to California to expand the availability of quality child care to low income families. California designated CDE as the lead agency for obligation and liquidation of the funds. Regulations under the Act specifically defined the terms "obligation" and "liquidation." See 45 C.F.R. § 98.60(d) (1991); see also 45 C.F.R. § 92.3 (1991).[2] California was required to obligate the $76.5 million in 1991 FBG funds by September 30, 1992 and liquidate the funds by September 30, 1994. See 45 C.F.R § 98.60(d) (1991). Funds not obligated and liquidated by the deadlines reverted to the Federal government. See 57 Fed.Reg. 150, 34424 (1992) (codified at 45 C.F.R. pt. 98.63).
 
 
 4
 As California's designee, CDE reported to the Federal Department of Health and Human Services ("HHS") regarding its obligation and liquidation of the funds. Although CDE originally intended to obligate the entire 1991 FBG funds to local child care contracts, its intentions changed in May 1992 due to the U.S. District Court for the Northern District of California order in Miller v. Healy ("Miller "), No. C-91-0676-SAW. In Miller, the district court ordered the California Department of Social Services ("CDSS") to provide child care services to a certain class of welfare recipients no later than July 1, 1992. As a result, CDE and CDSS entered into an interagency agreement whereby CDE made approximately $37.8 million in 1991 FBG funds available to CDSS to enable it to meet the Miller order. The agreement was executed on August 22, 1992, and made effective back to July 1, 1992. CDE's proposed use of the 1991 FBG funds was reviewed and approved by Sharon Fuji, Regional Administrator of HHS, by letter of July 13, 1992. An amended interagency agreement between CDE and CDSS was approved by the Department of General Services on October 15, 1992, fifteen days after the obligation deadline. Fuji subsequently declared that the CDE-CDSS interagency agreement was an appropriate and timely obligation under the regulations.
 
 
 5
 It was later determined that the demand for child care among welfare recipients was substantially lower than originally projected by the CDSS. Because only $5.2 million was actually expended under the interagency agreement, CDE terminated its agreement with DSS as of September 30, 1993, and re-obligated the remaining FBG funds to local child care providers through previously granted contracts. According to a declaration from Janet Poole, the CDE official in charge of administering the FBG funds, all of the remaining 1991 FBG funds were liquidated before September 30, 1994, using the first-in first-out method of accounting. In 1992 and 1994, CDE fiscal accounting manager Maurice McKowen filed financial reports with the federal government certifying that CDE had zero unobligated funds for the grant period ending September 30, 1992.
 
 
 6
 Hill brought his qui tam action under the FCA on February 27, 1995, alleging that CDE knowingly made false statements in order to prevent "unobligated" 1991 FBG funds from reverting to the federal government.[3] The United States declined to pursue this matter in its own behalf. After CDE moved for summary judgment on the ground that Hill failed to demonstrate knowing fraud, Hill filed a cross-motion for summary judgment. At oral argument, Hill contended that the major thrust of his FCA claim was that CDE falsely certified it had zero unobligated FBG funds: (1) knowing that the transfer of $37.8 million pursuant to the CDE-CDSS interagency agreement was not a proper "obligation" under the Act; and (2) knowing that the "obligation" was untimely.[4] The district court granted CDE's summary judgment motion and denied Hill's cross-motion on the grounds that: (1) none of Hill's evidence supported an inference of knowing fraud; and (2) even if CDE interpreted the Act incorrectly, it merely took advantage of a disputed legal question. The district court, however, found that CDE "mismanaged the funds and engaged in poor planning." Hill timely appeals.
 
 II.
 DISCUSSION
 
 7
 Hill contends that summary judgment was improper because the evidence demonstrated that CDE failed to obligate $37.8 million pursuant to the CDE-CDSS interagency agreement, yet falsely certified that it had done so. Appellant's Br. at 8-9. Hill, however, offers no argument and presents no authority on this issue.[5] Accordingly, we conclude that Hill has abandoned this issue. See Collins v. City of San Diego, 841 F.2d 337, 339 (9th Cir.1938) (claims which are not addressed in the appellant's brief are deemed abandoned and need not be considered); see also Northwest Acceptance Corp. v. Lynnwood Equipment, Inc., 841 F.2d 918, 923-24 (9th Cir.1988). Even were we to decide that Hill has not abandoned this issue, we conclude that Hill's contention lacks merit.
 
 
 8
 The knowing presentation of a false certification of compliance with laws, rules, or regulations, where federal funding is conditioned on such compliance, gives rise to a viable FCA action. United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1266-67 (9th Cir.1996), cert. denied, 117 S.Ct. 958 (1997).[6] The mere violation of laws, rules, or regulations, however, does not make out a viable FCA claim. Id. at 1267. "For a qui tam action to survive summary judgment, the relator must produce sufficient evidence to support an inference of knowing fraud." United States ex rel. Anderson v. Northern Telecom, Inc., 52 F.3d 810, 815 (9th Cir.1995), cert. denied, 116 S.Ct. 700 (1996). "Bad math is no fraud," proof of mistakes "is not evidence that one is a cheat," and "the common failings of engineers and other scientists are not culpable under the Act." Wang v. FMC Corp., 975 F.2d 1412, 1420-21 (9th Cir.1992). Moreover, taking advantage of a disputed legal question is not sufficient to show "knowing" fraud, nor is it sufficient to show deliberate ignorance or reckless disregard for the truth. Hagood v. Sonoma County Water Agency, 81 F.3d 1465, 1478-79 (9th Cir.1996), cert. denied, 117 S.Ct. 175 (1996).
 
 
 9
 Here, the evidence demonstrated that HHS was aware of the CDE-CDSS interagency agreement and approved of CDE's obligation of 37.8 million to CDSS. The record does not suggest that CDE reported a zero unobligated balance in 1991 FBG funds believing that its interagency agreement was contrary to the Act. In any case, the mere violation of laws, rules and regulations does not make out a viable FCA claim. See Hopper, 91 F.3d at 1266-67. At most, the evidence demonstrated a disputed legal question as to whether the interagency agreement satisfied the definitional and timeliness requirements of the Act and its accompanying regulations. None of Hill's evidence was sufficient to raise an inference of knowing fraud. See Hagood, 81 F.3d at 1478-79.
 
 
 10
 Hill additionally contends that summary judgment for CDE was improper because CDE's own evidence demonstrated that it failed to timely obligate approximately $27 to $29 million of the $76.5 million in FBG funds. Appellant's Br. at 4, 8, 10, 14. CDE argues in response that the issue is not properly before this court because Hill waived the issue below. Appellee's Br. at 6-7. Although we find support in the record for CDE's waiver argument, we nevertheless conclude that Hill's contention lacks merit.[7]
 
 
 11
 Hill argues that a 1993 Management Bulletin stating that CDE had $15 million in FBG funds "held in reserve" demonstrated that CDE did not timely obligate all of its 1991 FBG funds. Hill also refers to the 1994 deposition of Janet Poole, taken during 4-C's litigation against CDE, whereby Poole stated that CDE had $15 to $17 million in FBG funds "sitting there." Hill argues that such evidence raised an inference that: CDE falsely reported that it had zero unobligated 1991 FBG funds. Hill, however, offered no evidence that these figures represented CDE's true accounting picture, or that CDE fiscal accounting manager Maurice McKowen knew of such figures, at the time McKowen certified to the federal government that CDE had zero unobligated FBG funds. As the district court correctly concluded, evidence of possible mismanagement and poor planning is not sufficient to make out a viable FCA claim. See Anderson, 52 F.3d at 815 (requisite intent is the knowing presentation of what is known to be false, as opposed to innocent mistake or mere negligence). We conclude there is no direct evidence, and no evidence from which a jury could reasonably draw an inference, that CDE presented a false or fraudulent certification to the federal government. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) (mere existence of scintilla of evidence in support of plaintiff's evidence is insufficient; there must be evidence on which a jury could reasonably find for plaintiff).
 
 III.
 CONCLUSION
 
 12
 The district court's judgment is AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3
 
 
 [1]
 Our review on appeal is limited to the district court's grant of summary judgment in favor of CDE. See Datagate, Inc. v. Hewlett-Packard Co., 941 F.2d 864, 868 n. 1 (9th Cir.1991)
 
 
 [2]
 "Obligation" is defined as "the amounts of orders placed, contracts and subgrants awarded, goods and services received, and similar transactions during a given period that will require payment by the grantee during the same or a future period." See 45 C.F.P. § 92.3 (1991)
 
 
 [3]
 Hill served as independent contractor and employee of the Community Coordinated Child Development Council of Santa Clara County, Inc. ("4-C"). Hill's primary responsibility was to assist 4-C in state court litigation against CDE
 
 
 [4]
 In his memorandum of points and authorities in opposition to summary judgment, Hill argued that the interagency agreement was an invalid "obligation" because it transferred funds from one entity to another "at the same level of government." See 45 C.F.R. § 98.54 (1991)
 
 
 [5]
 Hill's opening brief states that he "chooses not to dwell on the failure by CDE and [C]DSS to have timely obligated and expended the $37.8 million improperly transferred under the Interagency Agreement" and that "the question of the Miller funds can be brought up upon remand." Appellant's Opening Br. at 8
 
 
 [6]
 In order to meet the FCA's scienter requirement, the relator must show that a person, with respect to the information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. See 31 U.S.C. § 3729(b) (1994)
 
 
 [7]
 At oral argument before the district court, Hill repeatedly framed the issue in terms of whether the CDE-CDSS interagency agreement constituted a proper and timely obligation of 1991 FBG funds. For example, in response to the district court's request to specifically identify the false statements at issue, the following exchange occurred:
 THE COURT: Your view, in looking at your papers, is [ ] that their claim goes really to the definition of "obligation" and maybe to the timing of that.
 MR. HERSHER [CDE's Counsel]: Correct, correct.
 THE COURT: Is that fair? Because when you respond to them, you spend a lot of energy on that issue.... But it seems to me, and I'll ask Mr. Zazueta [Hill's counsel] to clarify that for me in a minute, there seems to be a lot of other stuff that sort of is around it (Appellee's Excerpts of Record (ER) 37 at 16).
 * * * *
 THE COURT: On the reallotment, your argument on the reallotment basically is [ ] that they were not properly obligated--And they weren't timely obligated. And based upon that it would be reverting to the federal government.
 MR. ZAZUETA: That's our position. And also that the state, through its various functionaries, knew that. They knew about the need that these funds be reverted unless they were obligated. And so we say that they have attempted to obligate them in other ways like in the Miller v. Healey and in the setting aside funds for contingencies which were not mentioned as permissible under the plan or under the Act, at least not for the first year of funds (ER 37 at 19-20).
 * * * *
 THE COURT: So the major thrust, of all of the pages that I have plowed through, and all of the--what's happened to this money over the years, the major thrust is the obligation and the timing--
 MR. ZAZUETA: That's correct. And that what we've stated throughout is that the state agents know that there is a requirement that unallocated funds be reverted to the federal government. And it's this effort to try to obligate them elsewhere in order to not have them reverted that I think is the false claim that has occurred ... when, in fact, Ms. Janet Poole ... stated in her deposition to the contrary, saying there was at least $21 million that she knew of that were unavailable and were just laying there (ER 37 at 22-23).